**Arlam CARR et al., Plaintiffs,**

**v.**

**MONTGOMERY COUNTY BOARD OF EDUCATION; James W. Rutland, Jr., Fred Bear, George A. Dozier, Dr. J. Edward Walker, Isabelle B. Thomasson and Dr. Robert Parker, Members of the Montgomery County Board of Education; and Walter McKee, Superintendent of Education of Montgomery County, Alabama, Defendants,**

**United States of America, Amicus Curiae.**

**Civ. A. No. 2072-N.**

United States District Court
M. D. Alabama, N. D.

Feb. 24, 1968.

Order March 2, 1968.

Fred Gray and Solomon S. Seay, Jr., of Gray, Seay, Langford & Pryor, Montgomery, Ala., and Jack Greenberg and Charles H. Jones, New York City, for plaintiffs.

Stephen J. Pollak, Asst. Atty. Gen., Civil Rights Division, U. S. Dept. of Justice, Washington, D. C., Frank D. Allen, Jr., and Charles W. Quaintance, Attys., U. S. Department of Justice, Washington, D. C.; Ben Hardeman, U. S. Atty., Montgomery, Ala., for defendants.

## MEMORANDUM OPINION

FRANK M. JOHNSON, Jr., Chief Judge.

This cause is now submitted upon the motions of the United States filed August 17, 1967 and February 7, 1968, in both of which the United States requested this Court to require defendants to take further steps designed to disestablish the dual school system in Montgomery County, Alabama. Each of these motions seeks further faculty desegregation and the motion of February 7, 1968, asks this Court to require defendants to cease operation of their athletic program on a racially segregated basis and to take other steps designed to insure that certain new schools that have been and are being constructed as a part of the Montgomery County School System are operated on a desegregated basis. The plaintiffs join the United States in each of said motions.

This Court conducted a hearing on the Government's motion of August 17, 1967, in September, 1967. No formal findings or conclusions were made at that time by reason of the fact that the 1967–68 school year had already commenced, and the matter was therefore held in abeyance. On February 9, 1968, a hearing was conducted on the Government's second motion and the motion of the plaintiffs filed the same date wherein the plaintiffs seek more specific relief concerning transportation to the new schools.

Upon consideration of the evidence and the several exhibits thereto, this Court now makes the appropriate findings of fact and conclusions of law, embodying the same in this memorandum opinion. The original decree requiring desegregation of the public schools in Montgomery County, Alabama, was entered by this Court on July 31, 1964, D.C., 232 F.Supp. 705. After making appropriate findings and conclusions to the effect that the Montgomery County Board of Education was operating a segregated school system based upon race, this Court entered an injunction that enjoined the

defendants from failing to provide public school education for Negroes, and other members of their class, in a school or schools that were not operated on a racially segregated basis, and from failing to take immediate steps, to be effective for the school term commencing September, 1964, to desegregate the 1st, 10th, 11th and 12th grades in the public schools of Montgomery County, Alabama. In this decree, this Court approved a freedom-of-choice plan that had been proposed by the defendants as a means for discharging the affirmative duty placed upon them. Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). On March 22, 1966, this Court by formal order required the Montgomery County Board of Education to file a more formal and comprehensive plan for desegregation of the public school system in Montgomery County. D.C., 253 F.Supp. 306. This plan provided for complete desegregation of the schools for each grade in each school commencing with the September, 1967 school term; the plan also provided with regard to services, facilities, activities and programs:

A student shall have full access to all services, facilities, activities, and programs (including transportation, athletics, and other extracurricular activities) that may be conducted or sponsored by, or affiliated with the schools of the system. A student attending school for the first time on a desegregated basis may not be subject to any disqualification or waiting period for participation in activities and programs, including athletics, which might otherwise apply because he is a transfer student.

Further, the plan provided with regard to faculty and staff:

Race or color will henceforth not be a factor in the hiring, assignment, reassignment, promotion, demotion, or dismissal of teachers and other professional staff, with the exception that assignments shall be made in order to eliminate the effects of past discrimination. Teachers, principals, and staff members will be assigned to schools so that the faculty and staff is not composed of members of one race.

In the recruitment and employment of teachers and other professional personnel, all applicants or other prospective employees will be informed that Montgomery County operates a racially integrated school system and that members of its staff are subject to assignment in the best interest of the system and without regard to the race or color of the particular employee.

The Superintendent of Schools and his staff will take affirmative steps to solicit and encourage teachers presently employed to accept transfers to schools in which the majority of the faculty members are of a race different from that of the teacher to be transferred.

Teachers and other professional staff will not be dismissed, demoted, or passed over for retention, promotion, or rehiring on the ground of race or color. In any instance, where one or more teachers or other professional staff members are to be displaced as a result of desegregation or school closings, they shall be transferred to any position in the system where there is a vacancy for which they are qualified.

At the time this Court entered its order in July, 1964, there were in attendance approximately 15,000 Negro children and approximately 25,000 white children in the Montgomery County School System. The system was completely segregated by reason of race. No faculty desegregation was ordered until the commencement of the 1967 school year.[1] The evidence now present-

1. The order made and entered in this case on March 22, 1966, required the Montgomery County Board of Education to commence the process of desegregating

ed reflects that during the current school year the student population continues to be about the same as in 1964 and there are now approximately 550 Negroes attending through the freedom-of-choice procedure, traditionally white schools. No white children are attending traditionally Negro schools. As of February 9, 1968, 32 classroom teachers in this system were teaching pupils in schools that are predominantly of the opposite race. Defendants employ approximately 550 Negro teachers and approximately 815 white teachers in the system. Practically all the faculty desegregation in the system has occurred in the high schools. While there is some faculty desegregation in the elementary schools in the system, it is extremely small. There has been very little, if any, faculty desegregation in the schools located outside the City of Montgomery.

Since the order of this Court of June 1, 1967, defendants have assigned or transferred approximately 75 new teachers to faculties where their race was in the majority. Since the opening of school in September, 1967, defendants have hired approximately 32 new teachers—26 white and 6 Negro. Of the 26 new white teachers, only six or seven have been placed in predominantly Negro schools. All six Negroes were assigned to predominantly Negro schools. The evidence further reflects that the defendants have failed to take any appropriate steps to insure that substitute teachers are placed on a nonracial basis. No Negro has yet been a substitute teacher in a traditionally white school in Montgomery County. Negro substitutes were used over 1,500 times in Negro schools during the first semester of the 1967-

68 school year. During the same period, white substitute teachers were employed over 2,000 times—only 33 of them in traditionally Negro schools. There are approximately 162 white substitute teachers and 63 Negro substitute teachers available for use in the Montgomery County School System. Twenty-eight of the white substitute teachers whose names are on this list have, with defendants' permission, limited themselves to working only in predominantly white schools.

Defendants have adopted no adequate program for the assignment of student teachers on a desegregated basis. None of the approximately 150 student teachers used in the Montgomery County School System in the fall of 1967 were assigned to schools predominantly of the opposite race. Four Negro student teachers have very recently been assigned to predominantly white schools. There has been no faculty desegregation in the night schools operated by the Montgomery County School System.

The evidence does not reflect any real administrative problems involved in immediately desegregating the substitute teachers, the student teachers, the night school faculties, and in the evolvement of a really legally adequate program for the substantial desegregation of the faculties of all schools in the system commencing with the school year of 1968-69.

The evidence in this case reflects that the athletic programs are an integral part of the operation of the public schools in the Montgomery County School System. The Alabama High School Athletic Association is an association made up of approximately 357 Ala-

the faculty and professional staffs commencing with the school year 1966-67. However, on August 16, 1966, in the Mobile, Alabama school case of Davis, et al. v. Board of School Commissioners of Mobile County, et al., 364 F.2d 896, the United States Court of Appeals for the Fifth Circuit allowed the Mobile, Alabama County Board of Education until the school year 1967-68 to end its policy of hiring and assigning teachers and staff

according to race. On August 18, 1966, this Court entered an order reciting, "Uniformity, as well as fairness, requires this Court upon its own motion * * * to amend its order of March 22, 1966, to the extent that the Montgomery County School Board of Education be allowed until the school year of 1967-68 to end this present policy of hiring and assigning teachers and other school personnel according to race."

bama high schools traditionally maintained for white students and the Alabama Interscholastic Athletic Association is an association made up only of Alabama high schools traditionally maintained for Negro students. Each of these athletic associations has adopted rules for the scheduling of athletic contests by its members which have the effect of penalizing member schools if they play athletic contests with schools predominantly of the opposite race. The manner in which these associations accomplish this is through the promulgation of a rule to the effect that if any member school plays a nonmember school, it is subject to suspension or penalty. Thus the Montgomery County Board of Education, acting through its various school principals and coaching staffs, has allowed its traditionally white schools and its traditionally Negro schools to become members of the white and Negro associations, respectively, thereby placing them under the restrictive rules of these associations. Furthermore, the evidence reflects that the defendants through their agents—the principals and coaching staffs—have adopted a policy of scheduling interscholastic atheltic contests for its traditionally white schools only with other traditionally white schools, and for its traditionally Negro schools, only with other traditionally Negro schools. The evidence in this case is clear that this manner of operating the athletic programs has had and continues to have the effect of influencing the choice of students within the system.

The evidence further reflects that the defendants have continued to construct new schools and expand some existing schools; certainly, there is nothing wrong with this except that the construction of the new schools with proposed limited capacities geared to the estimated white community needs and located in predominantly white neighborhoods and the expansion of the existing schools located in predominantly Negro neighborhoods violate both the spirit and the letter of the desegregation plan for the Montgomery County School System. Examples of this are the construction of the Jefferson Davis High School, the Peter Crump Elementary School and the Southlawn Elementary School—all in predominantly white neighborhoods—and the expansion of Hayneville Road School and the Carver High School, both in predominantly Negro neighborhoods. The location of these schools and their proposed capacities cause the effect of this construction and the expansion to perpetuate the dual school system based upon race in the Montgomery County School System.

As to transportation, the defendants have failed to eliminate the bus routes where there exists overlapping and duplication based upon race. Thus the defendants have continued to perpetuate the dual school system through their transportation system. The defendants in designating three new schools located in predominantly white neighborhoods, viz., Jefferson Davis High, Peter Crump Elementary and Southlawn Elementary, as "nontransported" schools (schools to which no transportation is provided) are also attempting to further perpetuate the dual school system.

One of the most aggravating courses of conduct on the part of the defendants and their agents and employees relates to the new Jefferson Davis High School to be located in the City of Montgomery and operated commencing with the school year 1968–69. The defendants in locating this school placed it in a predominantly white section of Montgomery. The evidence reflects that in determining the capacity of the school they approximated the number of white students residing in the general vicinity and constructed the school accordingly; they have adopted a school name and a school crest that are designed to create the impression that it is to be a predominantly white school; they have hired a principal, three coaches and a band director, all of whom are white; they have actively engaged in a fund-

raising campaign for athletic and band programs only through white persons in the community; they have contacted only predominantly white schools for the scheduling of athletic events and they have made tentative arrangements to join the Alabama High School Athletic Association—the white association. Extensive publicity has been released concerning the white faculty members and the football schedule with all white schools. Discussion of the athletic program has been held by the new school officials only with white athletes. The dissemination of information about spring football practice in pamphlet form has been made by the school staff only to white persons.

■ All of this means that the defendants have failed to discharge the affirmative duty the law places upon them to eliminate the operation of a dual school system. Under such circumstances this Court considers it necessary and entirely appropriate to establish now more specific requirements governing minimum amounts of progress in the future in these several areas. In establishing these rules, it should be emphasized that strong consideration is given to the ratio of white to Negro students; however, in view of the fact that the plaintiffs and the United States have as of February 21, 1968, filed a motion to supplement the March 22, 1967, order of the three-judge court in Lee et al. v. Macon County Board of Education et al., D.C., 267 F.Supp. 458, in the area of school athletic programs, this Court will not at this time make any further specific findings, conclusions or order concerning the dual athletic program operated by the Montgomery County School System and will not at this time outline any steps that the defendants may be required to take in order to eliminate such practice. This phase of the matter as now presented will be reserved pending hearing and disposition of the motion in Lee, et al. v. Macon County Board of Education, et al., which is presently scheduled for a

hearing March 9, 1968 [Decided April 1, 1968, 283 F.Supp. 194].

The manner in which the defendants have constructed new schools, the location and proposed capacity of these schools, and the manner in which the defendants have expanded Negro schools and the location of these Negro schools make it clear that the effect of these new constructions and the effect of the expansions have been designed to perpetuate, and have the effect of perpetuating, the dual school system in the Montgomery County Schools. Furthermore, the operation of the school bus routes as presently operated by the defendants continues to violate the Fourteenth Amendment of the Constitution. Because of these factors this Court is under a duty and an obligation to outline and specify certain affirmative steps that must be taken by the defendants to eliminate the dual school system based upon race and to overcome the effects of certain efforts that have been made, as above outlined, to perpetuate this dual school system.

In implementing the requirements of this Court's orders heretofore made in this case and the supplemental requirements outlined herein and in the attached supplemental desegregation plan, the Montgomery County School Board, the individual members thereof, and particularly the principals of the several schools should be guided by three *caveats:*

■ First, the law will not tolerate any further undue delay in the desegregation of the public school systems. It has been almost fourteen years since school boards were placed under an affirmative duty to disestablish their dual school systems based upon race. Brown v. Board of Education of Topeka, supra. The Courts have recently—particularly in the Fifth Circuit—emphatically stated that no further delays in the desegregation process would be allowed. This was recognized and reaffirmed by the three-judge court in Lee v. Macon, supra, in its order of April

15, 1967 (unreported), when it was stated:

Further delay in the desegregation of Alabama public schools is inconsistent with existing law. The Supreme Court of the United States in Goss v. Board of Education, 373 U.S. 683 [83 S.Ct. 1405, 10 L.Ed.2d 632] (1963), stated: "Delays in desegregating school systems are no longer tolerable." See also Calhoun v. Latimer, 377 U.S. 263 [84 S.Ct. 1235, 12 L.Ed.2d 288]; Watson v. City of Memphis, 373 U.S. 526 [83 S.Ct. 1314, 10 L.Ed.2d 529], and Bradley v. School Board of City of Richmond, 382 U.S. 103 [86 S.Ct. 224, 15 L.Ed.2d 187] (1965). The law is clear that state authorities are "duty bound to devote every effort toward initiating desegregation and bringing about the elimination of racial discrimination in the public school system." Cooper v. Aaron, 358 U.S. 1, 7 [78 S.Ct. 1401, 3 L.Ed.2d 5]. Following this philosophy, the United States Court of Appeals for the Fifth Circuit has refused to permit delay in this area. Davis v. Board of School Commissioners of Mobile County, Alabama [5 Cir.], 322 F.2d 356 (1963); Singleton v. Jackson Municipal Separate School District [5 Cir.], 348 F.2d 729 (1965); United States v. Wilcox County Board of Education [5 Cir.], 366 F.2d 769 (1966).

■ Second, in the area of desegregating the faculties and staffs in the several schools in the system, the defendants may not justify or excuse any further delay upon the ground that some of the teachers are reluctant to teach in the schools predominantly of the opposite race. Again, the controlling legal principle in connection with this phase of the problem was announced by the three-judge court in Lee v. Macon, supra, in its order of June 14, 1967 (unreported), wherein the Court stated that desegregation of facilities and staffs must be accomplished "either by inducing voluntary transfers by teachers, the filling of vacancies, or, if they cannot achieve faculty desegregation by such means, then by the assignment and transfer of teachers from one school to the other."

■ Third, that unless the "freedom-of-choice" plan is more effectively and less dilatorily used by the defendants in this case, this Court will have no alternative except to order some other plan used. Caution in this area of the problem was expressed by the three-judge court in Lee v. Macon, supra, in its order of March 22, 1967, when it stated:

Invariably in this area of our country the "freedom-of-choice" plan has been chosen by the courts and the school systems themselves as the method to effectuate the requirements of the Fourteenth Amendment in the field of desegregation of public educational facilities. This is the plan which this Court will require—for the time being—these defendant officials to implement throughout the State of Alabama.[27] This Court recognizes that in the freedom-of-choice plan there are many administrative complexities. It may be that these administrative problems will make some other method advisable in the future. It may well be that the freedom-of-choice method of desegregation will not fully and completely disestablish the dual public school system based upon race.[28] However, for the time being, provided that all of the factors designed to influence and having the effect of influencing choice be eliminated, the freedom-of-choice plan will be put into effect upon a state-wide basis. It should be emphasized that, if choice influencing factors are not eliminated, freedom of choice is a fantasy. A "freedom-of-choice" plan ordered by a court or adopted by school authorities is not an end in itself; it is but a means to an end. The plan must operate in such a manner as to meet the constitutional mandate of the Fourteenth Amendment. As was stated in the concurring opinion in

Bradley v. School Board [4 Cir.], 345 F.2d 310, 323:

> Affirmative action means more than telling those who have long been deprived of freedom of educational opportunity, "you now have a choice." In many instances the choice will not be meaningful unless the administrators are willing to bestow extra effort and expense to bring the deprived pupils up to the level where they can avail themselves of the choice in fact as well as in theory * * * The district judge must determine whether the means exist for the exercise of a choice that is truly free and not merely pro forma.

27. The reasons are obvious why school officials have not chosen other plans such as the "neighborhood school" plan, for under such a plan white students would be immediately required to attend Negro schools located in their neighborhoods.

28. The United States Supreme Court has not yet ruled on the freedom-of-choice method of ending racial segregation in the field of public education. However, Goss v. Board of Education, 373 U.S. 683 [83 S.Ct. 1405, 10 L.Ed.2d 632] (1963), has been cited as support for such a plan. See Bradley v. School Board, 345 F.2d 310, 318 (4th Cir. 1965).

Several "freedom-of-choice" plans for desegregating dual school systems based upon race have recently been found as "not operating in a constitutionally acceptable manner." Coppedge v. Franklin County Board of Education (E.D.N.D. Aug.1967), 273 F.Supp. 289, and Moses v. Washington Parish School Board (E.D. La., Oct. 19, 1967), 276 F.Supp. 834.

In accordance with the foregoing, it is the order, judgment and decree of this Court that the defendants, their agents, officers, employees and successors, and all those in active concert or participation with them, shall adopt and implement the attached supplement to the desegregation plan herein ordered on June 1, 1967.

This Court specifically retains jurisdiction of this cause.

## SUPPLEMENT TO DESEGREGATION PLAN

### I. FACULTY AND STAFF

A. *Statement of Objective.*

In achieving the objective of the school system, that the pattern of teacher assignments to any particular school shall not be identifiable as tailored for a heavy concentration of either Negro or white pupils in the school, the school board will be guided by the ratio of Negro to white faculty members in the school system as a whole.

The school board will accomplish faculty desegregation by hiring and assigning faculty members so that in each school the ratio of white to Negro faculty members is substantially the same as it is throughout the system. At present, the ratio is approximately 3 to 2. This will be accomplished in accordance with the schedule set out below.

B. *Schedule for Faculty Desegregation.*

1. *1968–69.* At every school with fewer than 12 teachers, the board will have at least two full-time teachers whose race is different from the race of the majority of the faculty and staff members at the school.

At every school with 12 or more teachers, the race of at least one of every six faculty and staff members will be different from the race of the majority of the faculty and staff members at the school. This Court will reserve, for the time being, other specific faculty and staff desegregation requirements for future years.

C. *Means of Accomplishment.*

If the school board is unable to achieve faculty desegregation by inducing voluntary transfers or by filling vacancies, then it will do so by the assignment and transfer of teachers from one school to another.

D. *Substitute Teachers.*

Commencing March 1, 1968, the ratio of the number of days taught by white substitute teachers to the number of days taught by Negro substitute teachers at each school during each semester will be

substantially the same as the ratio of white substitute teachers to Negro substitute teachers on the list of substitute teachers at the beginning of the semester.

Commencing with the 1968–69 school year, the board will not use an individual as a substitute teacher in the Montgomery Public Schools if he will consent to substitute only at predominantly white schools or only at predominantly Negro schools.

E. *Student Teachers.*

Commencing March 1, 1968, the ratio of white to Negro student teachers each semester in each school that uses student teachers will be substantially the same as the ratio of white and Negro student teachers throughout the system.

F. *Night Schools.*

Commencing June 1, 1968, the ratio of white to Negro faculty members at each night school will be substantially the same as the ratio of white to Negro faculty members throughout the night-school program.

## II. NEW CONSTRUCTION

The school board will obtain approval from the State Superintendent of Education prior to letting contracts for or proceeding with the construction of any new school or any additions to an existing school. The State Superintendent will, upon receipt of such proposals, take appropriate action on said proposals as required by the March 22, 1967, decree entered in Lee, et al. v. Macon County Board of Education, et al., 267 F.Supp. 458, 470–472, 480–481.

## III. TRANSPORTATION

The school board will adopt nondiscriminatory bus routes and criteria governing the availability of bus transportation to students. Race will not be a basis for assigning students to school buses, and overlapping and duplicative bus routes based on race will be eliminated. By June 1, 1968, the school board will file with the Court the criteria it has adopted and a map or maps of bus routes for the 1968–69 school year. Along with the map, the school board will file a report indicating for each bus in its system, the number of students by race that the bus is expected to transport, the capacity of the bus, the number of miles the bus is expected to travel one way, and the school or schools the bus will serve. The board will serve the United States, as amicus curiae, with copies of the criteria, the report, and the map or maps.

## IV. JEFFERSON DAVIS HIGH SCHOOL, PETER CRUMP SCHOOL, AND SOUTHLAWN SCHOOL

The school board will take affirmative action to eradicate the effect of the efforts it and its employees have made to create the impression throughout the school system that Jefferson Davis High School, Peter Crump Elementary School and Southlawn Elementary School are to be used primarily by white students. The action will include, but not be limited to, the following steps:

A. *Letter to Eligible Students.*

By March 1, 1968, the school board will send to every student presently enrolled in grades 9, 10 and 11 in the public schools of Montgomery County a letter such as that set forth in Attachment A to this supplementary plan. A copy of the information sheet on choice forms and spring football practice, such as has heretofore been distributed to white students and parents, will be enclosed with each letter addressed to a male student.

B. *Visits to Schools.*

In the company of either the principal or a coach previously assigned to Jefferson Davis High School, that school's new coach will visit each high school and junior high school in Montgomery. They will inform the male students in grades 9, 10 and 11 at those schools of the rules concerning their eligibility to participate in athletics at Jefferson Davis High School. They will also inform the athletes when and where spring football practice is to begin for the new high school and of the procedures they should follow in order to participate. They will also make themselves available to an-

swer any questions these students may have about Jefferson Davis High School.

C. *Transportation.*

The school board will, on the choice forms, offer to provide transportation to Jefferson Davis High School, Peter Crump Elementary School and South-lawn Elementary School, until further order of this Court. The choice forms will indicate that transportation is to be provided to those schools. The school board will provide transportation to each student who chooses Jefferson Davis High School and who lives outside the City of Montgomery and more than two miles from the school and who lives near-er Jefferson Davis High School than either Lee or Lanier High School, in the absence of compelling circumstances approved by the Court on the school board's motion.

D. *Honoring Choices.*

The school board will honor the choice of each Negro student who chooses to attend Jefferson Davis High School during the 1968–69 school year, in the absence of compelling circumstances approved by the Court on the school board's motion.

## V. REPORTS

The school board will report to the Court every three months, beginning March 15, 1968, the steps taken to comply with the desegregation plan ordered into effect June 1, 1967, and with this supplementary plan. Plaintiffs and the United States will be served with copies of the reports.

A. *Reports Previously Ordered.*

The school board will include in reports filed each June 15 the "report on choice period" and "report on faculty assignments" described in Part VII of the plan ordered June 1, 1967. The report after school opening, also described in Part VII of the 1967 order, will become part of the reports filed each September 15.

B. *Faculty.*

1. *New teachers.* Each report filed will list each new teacher hired during the preceding three months and give his race and the school to which he is assigned.

2. *Substitute teachers.* Each report will list the number of days taught by substitute teachers, by race and by school, during the preceding three months, with the exception that the report filed March 15, 1968, will give this information only from the date of the order to which this supplementary plan is attached.

3. *Student teachers.* Each report will show by race the number of student teachers assigned during the preceding three months to each school having student teachers.

4. *Night schools.* Commencing June 15, 1968, each report will show by race the number of faculty and staff members assigned to the night program of each school having a night program.

C. *Transportation.*

Each report filed each year on September 15 will show, for each school bus, the number of students transported by race, the capacity of the bus, the number of miles it travels one way, and the school or schools it serves.

D. *Jefferson Davis High School and Other New Schools.*

The reports of March 15, 1968, June 15, 1968, and September 15, 1968, will show the steps the school board has taken to comply with Part V of this supplementary plan.

## ATTACHMENT A
## MONTGOMERY PUBLIC SCHOOLS

Date

Dear Student:

We are sending you this letter to inform you that you are eligible to attend Jefferson Davis High School if you choose to do so. The choice period for Montgomery County schools begins March 1, 1968, and you or your parents will be receiving a choice form within the next few days.

Jefferson Davis High School is a new school in southeast Montgomery, to be

opened in the fall of 1968. A senior high school only, it will have grades ten through twelve. Bus transportation to the school will be available to students who live outside the City of Montgomery and more than two miles from the school provided the student exercising such choice lives nearer Jefferson Davis than either Lee or Lanier High School.

We are in the process of forming a faculty and staff for the new school now. It will include a substantial number of persons of both races.

All students will be welcome to participate in all extracurricular activities, including athletics and band, on the same basis and without regard to race. Spring football practice is scheduled to begin March 4, 1968 at Cloverdale Junior High School. Two days before that, Saturday, March 2, at 9:30 a. m., prospective players will be fitted for equipment at the Cloverdale Community Center in Montgomery. All athletes who choose to attend Jefferson Davis High School are welcome to participate. You should read the enclosed instruction sheet (sent only to male students) if you are interested.

Sincerely,

Superintendent
Montgomery Public Schools

Enclosure

### ORDER

The motion of the Montgomery County Board of Education filed herein on February 28, 1968, seeking an order suspending and staying the order and injunction of this Court made and entered in this case on February 24, 1968, is now presented. The submission is upon the motion, the record and the arguments of counsel.

From 1954—when the Supreme Court of the United States put the Montgomery County School Board and other school boards throughout this country on notice that they could not continue under the law to operate a dual school system based on color—until this Court found it necessary to enter an order on July 31, 1964, requiring commencement of the desegregation of the public schools in Montgomery County, Alabama, the Montgomery County Board of Education had taken no steps and had made no plans whatsoever to comply with the law of this land in the area of school desegregation. Even though ten years had passed when this matter came on for a hearing in 1964, the Montgomery County Board of Education was allowed, by this Court, to proceed with desegregation gradually, for the reason that it was realized that desegregation of the public schools cut across the social fabric of this community and that there would be both administrative and other practical problems for the board to cope with in order to comply with the law. In the first phase of accomplishing desegregation of the public schools—that is, the adoption of a plan, which has been referred to as "paper compliance"—the Board of Education proceeded with the minimum required by the Court, but in a manner that was acceptable. The next stage of the desegregation process—the token desegregation of the schools and faculty—was also accomplished by the Board in an acceptable manner. However, we have reached the point where we must pass "tokenism," and the order that was entered in this case on February 24, 1968, is designed to accomplish this purpose. It was not designed to and was not intended to accomplish, and, if complied with, will not require more than the Supreme Court of the United States and the other appellate courts have held must be accomplished in order to desegregate a public school system.

The Board of Education in its motion to suspend and stay the order of this Court pending appeals—which may take a year or longer—emphasizes certain particular features of this Court's order of February 24, 1968. In some instances

658

the emphasis is misplaced, and certainly that part of the motion which states that the February 24, 1968, order "contains far reaching pronouncements of legal principles heretofore unprecedented in this District and this Circuit" is incorrect—both in law and in fact. The Montgomery board complains about that part of the order requiring assignment and transfer of faculty members, student teachers and substitute teachers according to a fixed ratio based on race. While this Court did state in its order of February 24, 1968, that the "ultimate objective" in faculty desegregation should be, because of the ratio of white to Negro faculty members in the school system, approximately 3 to 2, no schedule was set up to accomplish this "ultimate objective." The United States requested that a definite schedule be outlined for this accomplishment. However, gradualism has been found to work quite successfully in the past in this type case and particularly with the Montgomery County Board of Education, and gradualism is contemplated by this Court in accomplishing this "ultimate objective." What is actually required in the area of faculty desegregation in the high schools for the 1968–69 school year is very little—if any—more than the testimony reflects the school board planned without an additional court order. For instance, the school board presented testimony by Mr. Jack D. Rutland, the school principal for the new Jefferson Davis High School, to the effect that he contemplated hiring approximately 35 teachers, 7 of whom were to be Negroes. Thus, what is now ordered in the way of faculty desegregation as far as the Jefferson Davis High School is concerned is not as much as this Court was led to believe by the board's testimony would be accomplished by the board for the 1968–69 school year without any additional court order. This also applies to that part of the Court order as now amended requiring faculty desegregation for the other schools in the system. Thus, in the area of faculty desegregation, nothing more

is required of the Montgomery County School Board by the order of February 24, 1968, than the law requires as a minimum at this stage of the desegregation process and very little, if any, is required more than the school board, by its testimony, advised this Court it was going to do anyway.

The school board's complaint that the "ratio" requirement is unprecedented is inaccurate. In Board of Education of Oklahoma City Public Schools, etc. v. Dowell, 375 F.2d 158, 164 (10th Cir. 1967), it was observed that:

Among the specific recommendations found in the report and *embraced by the trial court's order* were:

\*　\*　\*　\*　\*　\*

(4) Desegregation of all faculty personnel so that by *1970* the faculty ratio of whites to non-whites in each school will be the same as the faculty ratio of whites to non-whites in the entire school system, subject to a reasonable tolerance of approximately 10%. [Emphasis added, footnote omitted.]

The Fifth Circuit has not addressed itself to the means to be employed to fully achieve faculty desegregation. It has approved "racial criteria" in assignments "in fashioning an appropriate remedy to undo past discrimination." United States v. Jefferson County Board of Education, 372 F.2d 836, 892 (5th Cir. 1967). The opinion in that case recognized that requiring a percentage ratio of teachers in the system was one method of meeting the problem:

We anticipate that when district courts and this Court have gained more experience with faculty integration, the Court will be able to set forth standards more specifically than they are set forth in the decrees in the instant case. 372 F.2d at 894.

In meeting this problem of faculty desegregation, other district courts have found it necessary to spell out in specific

numbers the degree of faculty desegregation required where the local school boards have not proceeded with "deliberate speed." See Coppedge v. Franklin County Board of Education, 273 F.Supp. 289 (E.D.N.C.1967); Kier v. County School Board, 249 F.Supp. 239 (W.D. Va.1966).

■ The school board also complains as to that feature of the order relating to transportation. The order as now amended does not require the school board to do anything in the area of transportation of students that is not already required of practically every school in the State of Alabama and particularly each of the 99 schools subject to the order of the three-judge court in Lee v. Macon County Board of Education, 267 F.Supp. 458. As a matter of fact, that part of the order of this Court of February 24, 1968, that relates to transportation is almost a duplicate of what is required of other schools throughout the State of Alabama in the area of transportation.

That particular feature of this Court's order of February 24, 1968, requiring transportation to the Jefferson Davis High School only requires transportation on the same basis that the school board is already providing it to Lee and Lanier High Schools. As was emphasized in the opinion and order of February 24, 1968, the Montgomery County School Board, according to the preponderance of the evidence, has set out to continue to operate—other than allowing token desegregation—a dual school system based upon race or color. The evidence clearly reflects that the manner in which this is to be accomplished is by the construction of schools with a limited capacity in virtually all-white neighborhoods. These capacities are not projected with the community growth in mind. The recent trend by the Montgomery board is to limit the capacity of these new schools to the present student population in these white enclaves. To perfect this plan, the school board has declared—before any choices are filed—that no transportation will be provided to the new Jefferson Davis High School, but that transportation will be provided to every other high school in the county. The announced justification for this is that the school will be filled to capacity without transporting any students. Thus, the board will, because of the location of these new schools (Jefferson Davis, Southlawn Elementary and Peter Crump Elementary), when it refuses to honor the choices of students who do not live in these white neighborhoods, be successful in operating exclusively white schools for white communities. At the same time the board has been doing this, it has been enlarging, through expansion programs, the Negro schools; these expansion programs are based upon the projected student growth. Through this means, the "freedom-of-choice plan" will not accomplish desegregation of the school system in Montgomery County, Alabama. If this system is permitted, the Montgomery board will be using the freedom-of-choice plan for part of the school system and the neighborhood school plan for another part of the system. The freedom-of-choice plan will be operating for schools such as Lee High, Lanier High, Capitol Heights Jr. High, Goodwyn Jr. High and others, and these schools will be desegregated. The Jefferson Davis High, Southlawn Elementary and Peter Crump Elementary Schools will be operated on a segregated basis—solely for the students residing in these exclusively white neighborhoods. The law will simply not permit the operation of such a system.

Furthermore, the evidence in this case is clear that the Jefferson Davis High School has been constructed in an exclusively white, predominantly high income-tax bracket community. To allow the Board of Education of Montgomery County, Alabama, to suceed in such a plan will not only be to discriminate against the Negro children who might elect to attend Jefferson Davis High School, but will also, according to some

theories, discriminate against white children who attend desegregated schools.

This Court has ordered no "busing" of students other than requiring the Board of Education to provide exactly the same type transportation and upon exactly the same basis as that already provided by the board to students attending Lee and Lanier High Schools.

The last aspect of this Court's order that the board by its motion considers innovative to the point that the order should be stayed pending appeal is that pertaining to honoring the choices of Negro students who choose to attend Jefferson Davis High School during the 1968–69 school year. As was emphasized in the February 24, 1968, order, the school board, through its agents and by its own practices, had set about to create and had created the impression throughout the system that the new air-conditioned Jefferson Davis High School was to be an exclusively white school. No reasonable conclusion could be reached other than that this was for the purpose of deterring any Negro student in the system from choosing the Jefferson Davis school for the 1968–69 school year. The impression had been created that the school was not available—even though the Montgomery Board of Education is theoretically operating under a freedom-of-choice plan—for anyone except the 850 students of the exclusively white, high-income group that comprise the community where the new school is located. Fairness and justice requires that something be done to counteract this aggravated type of discrimination. The order emphasizes that this feature is a temporary measure—presently designed only to operate during the 1968–69 school year. The order further emphasizes that the choices of Negro students electing to attend Jefferson Davis High School during the 1968–69 school year shall be honored *in the absence of compelling circumstances to be approved by this Court* on the school board's motion. As to this feature of

the order—as it has throughout this litigation—reasonableness will govern the Court's action.

When motions to stay orders and injunctions are filed by litigants in any type of litigation, normal judicial procedure requires—as was done in this case—that the motion to stay be presented to the judge entering the order sought stayed. This invariably places the judge in the position of being required to review and appraise his own order; that is the situation now presented. This Court firmly believes that each and every provision and requirement in the order and injunction made and entered in this case on February 24, 1968, is the minimum the applicable law will allow under the peculiar facts and circumstances presented and that each and every feature of the order and injunction entered in this case on February 24, 1968, is not only authorized but required by the applicable law. However, it is not felt that any of the litigants will be prejudiced if certain features of the order to which the Montgomery County Board of Education most strenuously objects are stayed for a limited time so as to afford the Board of Education a reasonable time to secure appellate review of these features of the order and injunction.

The feature with regard to transportation *generally* (which is, as has been emphasized, required of practically every other school in the State of Alabama), the features as now amended with regard to the desegregation of the substitute teacher program, the student teacher program and the night school program, will not be stayed. These do not even approach new or novel areas. That part of the order requiring the approval of the State Superintendent of Education prior to letting new contracts or expanding existing schools is not novel and will not be stayed. Those portions regarding reports to this Court are not novel and are not to be stayed. That provision of the injunction as now amended relating to faculty and staff set out in

Part I, B, will be stayed for a limited period pending an appeal. That provision of the order set out in Part IV, C, relating to transportation to the Jefferson Davis High School, Peter Crump Elementary School and Southlawn Elementary School, will be stayed for a limited time pending appeal. That provision of the order set out in Part IV, D, relating to the honoring of the choices of Negro students who elect to attend Jefferson Davis High School during the 1968–69 school year, in the absence of compelling circumstances approved by the court on the school board's motion, will be stayed for a limited time pending appeal. The remainder of the order, as stated above, will not be stayed.

There is a provision authorizing accelerated appeals where time is of the essence. This Court considers that time is of the essence as to these features of the injunction now being stayed pending this appeal. There is no reason why the school board, through its attorneys, cannot secure an accelerated hearing of this matter before a panel of the United States Court of Appeals for the Fifth Circuit. In this connection, both the board's and government's attorneys have orally assured this Court that they will seek to expedite the appeal of this case and will, by reason of the time limitations involved, request the Court of Appeals to accelerate the hearing and submission of the case. This will enable these features of the order to be reviewed by the appellate court prior to the commencement of the 1968–69 school year and will also, in the event one or more of the provisions of the February 24, 1968, order are affirmed, enable the school board to put them into effect for the 1968–69 school year. This procedure will allow appellate review of the order before it is scheduled to be effective and will also keep the Negro plaintiffs from being prejudiced by any further undue delay. In the opinion of this Court, five months will be ample time to afford the school board, through its attorneys, an opportunity to secure an appellate review of these matters. Therefore, a stay order as to these features herein enumerated will be entered and the order of this Court of February 24, 1968, as to these enumerated features will not be effective until August 1, 1968. Unless the school board secures an appellate review prior to that date, this stay now being entered will expire on that date. The Clerk of this Court and the official court reporter for this district stand ready to assist the school board in the preparation of the record in this case so as to facilitate the presentation of the matter to the appellate court.

Accordingly, it is the order, judgment and decree of this Court that the effective date for complying with, and making plans to comply with, those provisions in the injunction made and entered herein on February 24, 1968, set out in Part I, B (faculty desegregation), Part IV, C (transportation to Jefferson Davis High School, Peter Crump Elementary School and Southlawn Elementary School), and Part IV, D (the honoring of choices of Negro students who choose to attend Jefferson Davis High School during the 1968–69 school year) are hereby stayed until August 1, 1968.