UNITED STATES *v.* MONTGOMERY COUNTY
BOARD OF EDUCATION ET AL.

No. 798.   Argued April 28, 1969.—Decided June 2, 1969.*

*Solicitor General Griswold* argued the cause for the
United States in No. 798.   With him on the brief were
*Assistant Attorney General Leonard* and *Deputy Assist-
ant Attorney General Lewin.   Jack Greenberg* argued
the cause for petitioners in No. 997.   With him on the
brief were *Fred D. Gray, James M. Nabrit III, Melvyn
Zarr, Franklin E. White,* and *Elizabeth B. DuBois.*

*Joseph D. Phelps* argued the cause and filed a brief
for respondents in both cases.

MR. JUSTICE BLACK delivered the opinion of the Court.

In this action the United States District Court at Mont-
gomery, Alabama, ordered the local Montgomery County
Board of Education to bring about a racial desegregation

---

*Together with No. 997, *Carr et al.* v. *Montgomery County Board
of Education et al.,* also on certiorari to the same court.

of the faculty and the staff of the local county school system. 289 F. Supp. 647 (1968). Dissatisfied with the District Court's order, the board appealed. A panel of the Court of Appeals affirmed the District Court's order but, by a two-to-one vote, modified it in part, 400 F. 2d 1 (1968).[1] A petition for rehearing *en banc* was denied by an evenly divided court, six to six, thereby leaving standing the modifications in the District Court's order made by the panel.[2] On petitions of the United States as intervenor below in No. 798, and the individual plaintiffs in No. 997, we granted certiorari. 393 U. S. 1116 (1969).

Fifteen years ago, on May 17, 1954, we decided that segregation of the races in the public schools is unconstitutional. *Brown* v. *Board of Education,* 347 U. S. 483 (*Brown I*). In that case we left undecided the manner in which the transition from segregated to unitary school systems would be achieved, and set the case down for another hearing, inviting the Attorney General of the United States and the Attorneys General of the States providing for racial segregation in the public schools to present their views on the best ways to implement and enforce our judgment. We devoted four days to the argument on this single problem, and all the affected parties were given the opportunity to present their views at length. After careful consideration of the many viewpoints so fully aired by the parties, we announced our decision in *Brown II,* 349 U. S. 294 (1955). We held that the primary responsibility for abolishing the system of segregated schools would rest with the local school authorities. In some of the States that argued before us, the laws permitted but did not require racial segregation,

---

[1] The dissent from the original panel opinion is reported at 402 F. 2d 782.

[2] The dissents from the denial *en banc* of the petition for rehearing are reported at 402 F. 2d, at 784, 787.

and we noted that in some of these States "substantial steps to eliminate racial discrimination in public schools have already been taken . . . ." *Id.*, at 299. Many other States had for many years maintained a completely separate system of schools for whites and nonwhites, and the laws of these States, both civil and criminal, had been written to keep this segregated system of schools inviolate. The practices, habits, and customs had for generations made this segregated school system a fixed part of the daily life and expectations of the people. Recognizing these indisputable facts, we neither expected nor ordered that a complete abandonment of the old and adoption of a new system be accomplished overnight. The changes were to be made "at the earliest practicable date" and with "all deliberate speed." *Id.*, at 300, 301. We were not content, however, to leave this task in the unsupervised hands of local school authorities, trained as most would be under the old laws and practices, with loyalties to the system of separate white and Negro schools. As we stressed then, "[I]t should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them." *Id.*, at 300. The problem of delays by local school authorities during the transition period was therefore to be the responsibility of courts, local courts so far as practicable, those courts to be guided by traditional equitable flexibility to shape remedies in order to adjust and reconcile public and private needs. These courts were charged in our *Brown II* opinion, *id.*, at 300, with a duty to:

> "require that the defendants [local school authorities] make a prompt and reasonable start toward full compliance with our May 17, 1954, ruling. Once such a start has been made, the courts may find that additional time is necessary to carry out the ruling in an effective manner. The burden rests

upon the defendants to establish that such time is necessary in the public interest and is consistent with good faith compliance at the earliest practicable date."

The record shows that neither Montgomery County nor any other area in Alabama voluntarily took any effective steps to integrate the public schools for about 10 years after our *Brown I* opinion. In fact the record makes clear that the state government and its school officials attempted in every way possible to continue the dual system of racially segregated schools in defiance of our repeated unanimous holdings that such a system violated the United States Constitution.[3]

There the matter stood in Alabama in May 1964 when the present action was brought by Negro children and their parents, with participation by the United States as *amicus curiae*. Apparently up to that time Montgomery County, and indeed all other schools in the State, had operated, so far as actual racial integration was concerned, as though our *Brown* cases had never been decided. Obviously voluntary integration by the local school officials in Montgomery had not proved to be even partially successful. Consequently, if Negro children of school age were to receive their constitutional rights as we had declared them to exist, the coercive assistance of courts was imperatively called for. So, after preliminary procedural matters were disposed of, answers filed, and issues joined, a trial took place. On July 31, 1964, District Judge Johnson handed down an opinion and entered an

---

[3] A substantial part of the history of the continued support by Alabama's governor and other state officials for its dual system of schools, completely separating white and nonwhite students, faculty, and staff, can be found in the opinion of the three-judge court for the Middle District of Alabama in *Lee* v. *Macon County Board of Education*, 267 F. Supp. 458 (1967), affirmed by this Court under the title of *Wallace* v. *United States*, 389 U. S. 215 (1967).

order.  232 F. Supp. 705.  The judge found that at the time:

> "There is only one school district for Montgomery County, Alabama, with the County Board of Education and the Superintendent of Education of Montgomery County, Alabama, exercising complete control over the entire system.  In this school system for the school year 1963–64, there were in attendance approximately 15,000 Negro children and approximately 25,000 white children.  In this system the Montgomery County Board of Education owns and operates approximately 77 schools.
>
> "From the evidence in this case, this Court further specifically finds that, through policy, custom and practice, the Montgomery County Board of Education, functioning at the present time through the named individual defendants, operates a dual school system based upon race and color; that is to say, that, through this policy, practice and custom, these officials operate one set of schools to be attended exclusively by Negro students and one set of schools to be attended exclusively by white students.  The evidence further reflects that the teachers are assigned according to race; Negro teachers are assigned only to schools attended by Negro students and white teachers are assigned only to schools attended by white students."  232 F. Supp., at 707.

Based on his findings, Judge Johnson ordered that integration of certain grades begin in September 1964, but in this first order did not require efforts to desegregate the faculty.  The school board, acting under the State's school placement law, finally admitted eight Negro students out of the 29 who had sought transfers to white schools under the judge's July 31 order.  The judge refused to order admission of the 21 Negro students

whose transfer applications had been rejected by the school officials.

The 1964 initial order of Judge Johnson was followed by yearly proceedings, opinions, and orders by him.[4] Hearings, preceding these additional orders, followed the filing each year under the judge's direction of a report of the school board's plans for proceeding with desegregation. These annual reports and orders, together with transcripts of the discussions at the hearings, seem to reveal a growing recognition on the part of the school board of its responsibility to achieve integration as rapidly as practicable. The record, however, also reveals that in some areas the board was not moving as rapidly as it could to fulfill this duty, and the record shows a constant effort by the judge to expedite the process of moving as rapidly as practical toward the goal of a wholly unitary system of schools, not divided by race as to either students or faculty. During these years of what turned out to be an exchange of ideas between judge and school board officials, the judge, from time to time, found it possible to compliment the board on its cooperation with him in trying to bring about a fully integrated school system. Some of these complimentary remarks are set out in the opinion of the Court of Appeals modifying the judge's decree. 400 F. 2d, at 3, n. 3. On the other hand the board did not see eye to eye with Judge Johnson on the speed with which segregation should be wiped out "root and branch" as we have held it must be done. *Green* v. *County School Board,* 391 U. S. 430, 438 (1968). The school board, having to face the "complexities arising from the transition to a system of public education freed of racial discrimination," *Brown II,* 349 U. S., at 299, was constantly sparring for

---

[4] These orders were reported as follows: May 18, 1965, 10 Race Rel. L. Rep. 582; March 22, 1966, 253 F. Supp. 306; August 18, 1966, 11 Race Rel. L. Rep. 1716; June 1, 1967, 12 Race Rel. L. Rep. 1200.

time; the judge, upon whom was thrust the difficult task of insuring the achievement of complete integration at the earliest practicable date, was constantly urging that no unnecessary delay could be allowed in reaching complete compliance with our mandate that racially segregated public schools be made nothing but a matter of past history. In this context of clashing objectives it is not surprising that the judge's most recent 1968 order should have failed fully to satisfy either side. It is gratifying, however, that the differences are so minor as they appear to us to be.

In his 1968 order Judge Johnson provided for safeguards to assure that construction of new schools or additions to existing schools would not follow a pattern tending to perpetuate segregation. The order also provided for the adoption of nondiscriminatory bus routes and for other safeguards to insure that the board's transportation policy would not tend to perpetuate segregation. The order provided for detailed steps to eliminate the impression existing in the school district that the new Jefferson Davis High School and two new elementary schools were to be used primarily by white students. The order also included a requirement that the board file in the near future further specific reports detailing the steps taken to comply with each point of the order. Nearly all of these aspects of the order were accepted by the school board and not challenged in its appeal to the Court of Appeals. Of the provisions so far mentioned, only one aspect of the provision relating to Jefferson Davis High School was challenged in the Court of Appeals, and after the Court of Appeals upheld Judge Johnson's order on this point, the school board accepted its decision and did not seek review on the question here.

The dispute in this action thus centers only on that part of the 1968 order which deals with faculty and staff

desegregation, a goal that we have recognized to be an important aspect of the basic task of achieving a public school system wholly free from racial discrimination. See, *e. g.*, *Bradley* v. *School Board*, 382 U. S. 103 (1965); *Rogers* v. *Paul*, 382 U. S. 198 (1965). Judge Johnson noted that in 1966 he had ordered the board to begin the process of faculty desegregation in the 1966–1967 school year but that the board had not made adequate progress toward this goal. He also found:

> "The evidence does not reflect any real administrative problems involved in immediately desegregating the substitute teachers, the student teachers, the night school faculties, and in the evolvement of a really legally adequate program for the substantial desegregation of the faculties of all schools in the system commencing with the school year of 1968–69." 289 F. Supp., at 650.

He therefore concluded that a more specific order would be appropriate under all the circumstances to establish the minimum amount of progress that would be required for the future. To this end his order provided that the board must move toward a goal under which "in each school the ratio of white to Negro faculty members is substantially the same as it is throughout the system." *Id.*, at 654. In addition, the order set forth a specific schedule. The ratio of Negro to white teachers in the assignment of substitute, student, and night school teachers in each school was to be almost immediately made substantially the same as the ratio of Negro to white teachers in each of these groups for the system as a whole. With respect to full-time teachers, a more gradual schedule was set forth. At the time the ratio of white to Negro full-time teachers in the system as a whole was three to two. For the 1968–1969 school year, each school with fewer than 12 teachers was required to

have at least two full-time teachers whose race was different from the race of the majority of the faculty at that school, and in schools with 12 or more teachers, the race of at least one out of every six faculty and staff members was required to be different from the race of the majority of the faculty and staff members at that school. The goals to be required for future years were not specified but were reserved for later decision. About a week later Judge Johnson amended part of the original order by providing that in the 1968–1969 term schools with less than 12 teachers would be required to have only one full-time teacher of the minority race rather than two, as he had originally required.

It was the part of the District Court's order containing this ratio pattern that prompted the modification of the order by the Court of Appeals. Agreeing that the District Court had properly found from "extensive hearings . . . that desegregation of faculties in the Montgomery County school system was lagging and that appellants [the school board] had failed to comply with earlier orders of the court requiring full faculty desegregation," and noting that the testimony of school officials themselves indicated the need for more specific guidelines,[5]

---

[5] The Court of Appeals quoted the following excerpt from the testimony of Associate Superintendent W. S. Garrett:

"Q. Well, under your plan, when do you estimate that faculty desegregation will be finally accomplished in terms of the objective of the court order removing—

"A. Well, now, that is something I don't know, because I don't know what the objectives of the court order are. That has never been laid down in any percentage fashion that I know of. It says that you will have reasonable desegregation of faculty and that you will strive toward having each faculty not recognizable as being staffed for a particular race. That is what I get out of it.

"Q. Well, let—

"A. So I— I can't— this court order is in fairly general terms; I can't answer that question.

"Q. Well, you made the statement about having schools staffed so

234

the Court of Appeals nevertheless struck down parts of the order which it viewed as requiring "fixed mathematical" ratios. It held that the part of the order setting a specific goal for the 1968–1969 school year should be modified to require only *"substantially* or *approximately"* the 5–1 ratio required by Judge Johnson's order. With respect to the ultimate objective for the future, it held that the numerical ratio should be eliminated and that compliance should not be tested solely by the achievement of specified ratios. In so holding, the Court of Appeals made many arguments against rigid or inflexible orders in this kind of case. These arguments might possibly be more troublesome if we read the District Court's order as being absolutely rigid and inflexible, as did the Court of Appeals. But after a careful consideration of the whole record we cannot believe that Judge Johnson had any such intention. During the four or five years that he held hearings and considered the problem before him, new orders, as previously shown, were issued annually and sometimes more often. On at least one occasion Judge Johnson, on his own motion, amended his outstanding order because a less stringent order for another

---

that they will not be recognizable as for a particular race; when do you expect that that will be accomplished?

"A. Well, that would depend on what the Board's definition of that is, the court's definition of that.

"Q. Do you have a definition of that?

"A. Not at this point; we have discussed that many times, and I do not have a definition of— of what that would mean.

"Q. No one has told you, given you a definition in terms of mechanics, in terms of numbers, none of your superiors?

"A. No, as far as I know, no other school personnel man in America has. I have talked to many of them. What we are striving to do is to make progress and keep going and hope that somewhere along the line we will have achieved the— what the court has in mind. But if you will look at that court order, you will see it doesn't lay down the precise terms exactly what that means; it is a broad definition."

district had been approved by the Court of Appeals. This was done in order not to inflict any possible injustice on the Montgomery County school system. Indeed the record is filled with statements by Judge Johnson showing his full understanding of the fact that, as this Court also has recognized, in this field the way must always be left open for experimentation.[6]

Judge Johnson's order now before us was adopted in the spirit of this Court's opinion in *Green* v. *County School Board, supra,* at 439, in that his plan "promises realistically to work, and promises realistically to work *now.*" The modifications ordered by the panel of the Court of Appeals, while of course not intended to do so, would, we think, take from the order some of its capacity to expedite, by means of specific commands, the day when a completely unified, unitary, nondiscriminatory school system becomes a reality instead of a hope. We believe it best to leave Judge Johnson's order as written rather than as modified by the 2–1 panel, particularly in view of the fact that the Court of Appeals as a whole was evenly divided on this subject. We also believe that under all the circumstances of this case we follow the original plan outlined in *Brown II,* as brought up to date by this Court's opinions in *Green* v. *County School Board, supra,* and *Griffin* v. *School Board,* 377 U. S. 218, 233–234 (1964), by accepting the more specific and

---

[6] As we stated in *Green* v. *County School Board, supra,* at 439: "There is no universal answer to complex problems of desegregation; there is obviously no one plan that will do the job in every case. The matter must be assessed in light of the circumstances present and the options available in each instance. It is incumbent upon the school board to establish that its proposed plan promises meaningful and immediate progress toward disestablishing state-imposed segregation. It is incumbent upon the district court to weigh that claim in light of the facts at hand and in light of any alternatives which may be shown as feasible and more promising in their effectiveness."

expeditious order of Judge Johnson, whose patience and wisdom are written for all to see and read on the pages of the five-year record before us.

It is good to be able to decide a case with the feelings we have about this one. The differences between the parties are exceedingly narrow. Respondents, members of the Montgomery County school board, state clearly in their brief, "These respondents recognize their affirmative responsibility to provide a desegregated, unitary and nonracial school system. These respondents recognize their responsibility to assign teachers without regard to race so that schools throughout the system are not racially identifiable by their faculties . . . ." Brief for Respondents 11–12. Petitioners, on the other hand, do not argue for precisely equal ratios in every single school under all circumstances. As the United States, petitioner in No. 798, recognizes in its brief, the District Court's order "is designed as a *remedy for* past racial assignment . . . . We do not, in other words, argue here that racially balanced faculties are constitutionally or legally required." Brief for the United States 13. In short, the Montgomery County school board, and its counsel, assert their purpose to bring about a racially integrated school system as early as practicable in good-faith obedience to this Court's decisions. Both the District Judge and the Court of Appeals have accorded to the parties and their counsel courteous and patient consideration; there is no sign of lack of interest in the cause of either justice or education in the views maintained by any of the parties or in the orders entered by either of the courts below. Despite the fact that the individual petitioners in this litigation have with some reason argued that Judge Johnson should have gone farther to protect their rights than he did, we approve his order as he wrote it. This, we believe, is the best course we can take in the interest of the petitioners and the public school system of Alabama.

We hope and believe that this order and the approval that we now give it will carry Alabama a long distance on its way toward obedience to the law of the land as we have declared it in the two *Brown* cases and those that have followed them.

The judgment of the Court of Appeals is reversed, and the cases are remanded with directions to affirm the judgment of the District Court.

*It is so ordered.*