James E. SWANN et al., Plaintiffs,

v.

The **CHARLOTTE – MECKLENBURG BOARD OF EDUCATION**; Mr. William E. Poe, Chairman; Mr. Henderson Belk; Mr. Dan Hood; Mr. Ben F. Huntley; Mrs. Betsey Kelly; Rev. Coleman W. Kerry, Jr.; Mrs. Julia Maulden; Mr. Sam S. McNinch, III; and Dr. Carlton G. Watkins, Defendants.

No. 1974.

United States District Court
W. D. North Carolina,
Charlotte Division.

June 20, 1969.

See also, 369 F.2d 29.

J. Levonne Chambers and Adam Stein, Charlotte, N. C., for plaintiffs.

Brock Barkley and William J. Waggoner, Charlotte, N. C., for Bd. of Education.

Gaston H. Gage, Charlotte, N. C., for William E. Poe, Chairman, individually.

## OPINION AND ORDER

McMILLAN, District Judge.

Pursuant to notice dated June 4, 1969, a hearing was held in Charlotte on June 16, 17 and 18, 1969, on various matters including (1) the motion of the individual defendants for dismissal; (2) the motion of the plaintiffs for contempt citations against the individual defendants; (3) the proposals offered by the defendants pursuant to the April 23, 1969 order as a plan for desegregating the Charlotte-Mecklenburg schools; and (4) the motion of the plaintiffs for an

order restraining further school construction until the segregation issue has been satisfactorily resolved.

## I.

## THE MOTION OF THE SCHOOL BOARD MEMBERS TO DISMISS

■ The motion of the individual defendants, members of the school board, to dismiss was and is denied. This is a suit under the Civil Rights Act involving questions of equal protection of laws and racial discrimination and segregation in the public schools. The individual defendants are proper parties and their presence is appropriate and desirable.

## II.

## THE MOTION FOR A CONTEMPT CITATION.

■ The motion of the plaintiffs that the individual defendants be found in contempt of the court is on this record denied. The board is badly divided and many of its recent decisions appear to be made by a five to four vote. Supreme Court judges now and then make five to four decisions. (Fortunately their votes in all major school segregation cases appear to have been unanimous.) The members of the board have had uncomplimentary things to say about each other and about the court, and many of them obviously disagree with the legality and propriety of the order of the court; but these latter sentiments may be regarded by the court as evidence of disagreement with rather than contempt for the court who is himself not far removed from active participation in the time-honored custom of criticizing a judge who has ruled against him. Moreover, on an issue of such significance, the amount of foot-dragging which has taken place, up to now at least, should not be considered as contempt of court.

## III.

## THE PLAN OF THE DEFENDANTS.

1. *The history of the plan.*—The order of this court directing a further plan for desegregation was entered April 23, 1969. Within hours, various of the defendants expressed sharp views pro and con. The board met on April 28, 1969, and for the first time briefly discussed the order. By a five to four margin, apparently, they decided informally not to try to appeal immediately, upon the basis that the right of appeal from the order to prepare a plan was doubtful. The school superintendent was instructed to prepare a desegregation plan. No express guidelines were given the superintendent. However, the views of many members expressed at the meeting were so opposed to serious and substantial desegregation that everyone including the superintendent could reasonably have concluded, as the court does, that a "minimal" plan was what was called for, and that the "plan" was essentially a prelude to anticipated disapproval and appeal. In a county and city criss-crossed by school bus routes for 23,000 pupils, more than twenty thousand citizens, mostly from affluent suburbia, many of whose children undoubtedly go to school on school busses, signed petitions against "involuntary" bussing of students. The frenzy of parents received a ready forum in televised meetings of the board. The staff were never directed to do any serious work on re-drawing of school zone lines, pairing of schools, combining zones, grouping of schools, conferences with the Department of Health, Education and Welfare, nor any of the other possible methods of making real progress towards desegregation.

The superintendent revealed the general terms of his plan within a few days and later presented it formally on May 8, 1969. It provided for full faculty desegregation in 1969, which the superintendent said he considered feasible. It provided moderate changes in the pupil assignment plans; and it contemplated

future study of the other methods of desegregation suggested in the April 23, 1969 order.

The board then met, struck out virtually all the effective provisions of the superintendent's plan, and asked for more time from the court, which had previously been promised.

The board's committee on buildings and sites, newly re-constituted, met and voted to cancel the long standing plans for Metropolitan High School, and voted to build it as only a specialty and vocational school without including the comprehensive high school which consultants and experts, including the school board's staff and superintendent, had recommended and still recommend. No new facts except the order of court had developed to account for the sudden change of plan. The stated reason for the change was that a general high school in Second Ward (though not a vocational or a technical school) would necessarily be black and therefore should not be built. [The Second Ward school site, where Metropolitan is scheduled to be built, is squarely in the center of the city's population; is a scant four blocks from the south boundary of its zone; and is apparently the easiest high school in town to desegregate; its boundaries could easily be re-drawn by extending its southern boundary (Morehead Street) and its eastern boundary (Queens Road) a few blocks.]

Thereafter, on May 28, 1969, the plan was filed. Volunteers were requested among the teachers; pupil transfer requests were set out; and data on the workings of the plan began to accumulate.

During the early debate over the court order, events transpired between the chairman and the superintendent which were thought by an assistant superintendent and others to threaten the superintendent's job if he pushed for compliance with the court's order. A few days before this hearing, the board committee on personnel declined to accept the superintendent's recommendation that Robert Davis, a Negro, be appointed principal of one of the schools. This was the first time such a recommendation had not been accepted. After some debate, the decision was postponed, with the superintendent requested to bring in alternate names. The publicly stated reasons for not approving the appointment were that Davis, whose training, experience and qualifications were unquestioned, is a plaintiff in this case and a member of the Negro Classroom Teachers Association and has spoken out publicly in favor of compliance with this court's order—including one television appearance before the board itself to which the board had invited interested citizens. Davis, according to the press, was eventually confirmed for the job on June 19, 1969, but only after a "loyalty oath" had been exacted. The effect of the so-called "job threat" and the Davis incident, following the public statements of board members, is a clear message: School employees voice opinion contrary to the board majority on desegregation at personal risk.

■ 2. *The June 16, 1969 hearing.*—The defendants, under the law, had the burden of showing that their plan would desegregate the schools. To carry that burden they introduced a short written brief and some statistical data and rested their case without live testimony. The plaintiffs called all members of the school board and the Rhode Island expert, Dr. Finger, who testified at the March hearing, and a few other witnesses. There was some rebuttal from the board.

3. *Findings as to General Board Policy.*—

a) The board does not admit nor claim that it has any positive duty to promote desegregation.

b) School sites and school improvements have not been selected nor planned to promote desegregation and the board admits no such duty.

c) Board policy is that the Constitution is satisfied when they locate schools where children are and pro-

vide "freedom of transfer" for those who want to change schools.

d) Despite its inclusion in the "Plan," the decision of the board about Metropolitan High School is not really a final one; several members consider the issue in doubt, and the full board has not formally considered it.

4. *The Pupil Assignment Plan.*—The plan now proposed is the plan previously found racially discriminatory, with the addition of one element—the provision of transportation for children electing to transfer out of schools where their races are in a majority to schools where they will be in a minority. Such provision of transportation is approved.

■ Another provision of the plan makes high school athletes who transfer from one school to another ineligible for varsity or junior varsity athletics until they have been a year in the new school. For the current year, with the returns almost complete, only two white students out of some 59,000 have elected to transfer from white schools to black schools. Some 330 black students out of some 24,000 have elected to transfer to white schools. Only the tiniest handful of white students have ever in any year asked to transfer to black schools. The effect of the athletic penalty is obvious —it discriminates against black students who may want to transfer and take part in sports, and is no penalty on white students who show no desire for such transfers. The defendants' superintendent considers athletics an important feature of education. This penalty provision is racially discriminatory. The board is directed not to enforce it any more and to give adequate individual notice to all rising 10th, 11th and 12th grade students that they may reconsider their previous choice of schools in light of the removal of the penalty.

■■ Freedom of transfer increases rather than decreases segregation. The school superintendent testified that there would be, net, more than 1,200 additional white students going to predom-

inantly black schools if freedom of transfer were abolished. The use of a free transfer provision is a decision for the board; it may make desegregation more palatable to the community at large; it is not, per se, if the schools are desegregated, unconstitutional. Nevertheless, *desegregation of schools is something that has to be accomplished independent of freedom of transfer.* This is a fact which because of the complexity of the statistics has only become clear to the court since the previous order was issued.

5. *The Faculty Assignment Plan.*—The plan originally proposed by the superintendent would have desegregated the faculty as a routine matter in 1969. The plan proposed by the board however is not materially different from the already existing plan. It continues to rely upon voluntary transfers and it contemplates affirmative assignment of teachers to black schools only late in the day after a hopeful routine of filling vacancies (some of which do not exist) has been followed. The board has not taken a position of leadership with the teachers and the results are apparent. Only 28 out of 2,700 white teachers, and only 38 out of 900 black teachers, had on June 18, 1969 indicated a willingness to transfer to schools of the opposite race. Testimony of the board members who comprise the majority of the board suggests that they do not really contemplate substantial faculty desegregation and that they may consider figures of "10%"; or one black teacher to each white school and one white teacher to each black school; or filling vacancies from the opposite race as they arise, to be compliance with the needs of the situation. None of these ideas, of course, amounts to desegregation of the faculty. The evidence submitted by the board does not demonstrate that the faculty plan will work. Several board members said that the plan to assign teachers is not an "idle promise."

All that it takes to make the faculty plan work is timely decision by the board to implement the assignment of

teachers. Board members are requested in this connection to consider the latest unanimous Supreme Court decision, United States v. Montgomery County Board of Education, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (October Term 1968), decided June 2, 1969, reversing the Fifth Circuit Court of Appeals and upholding a district court order for faculty desegregation under a mathematical formula. Ruling on the faculty plan will therefore be deferred until after August 4, 1969, by which time the board is directed to file a report stating in detail what the plan has done and what the status of faculty assignments then is. The court considers the faculty assignment plan to be important and agrees with the superintendent of schools that immediate desegregation of the faculty is feasible. This is a substantial improvement which is available without arousing ghosts of "bussing," "neighborhood schools," or additional expense.

## IV.

## GERRYMANDERING.

This issue was passed over in the previous opinion upon the belief which the court still entertains that the defendants, as a part of an overall desegregation plan, will eliminate or correct all school zones which were created or exist to enclose black or white groups of pupils or whose population is controlled for purposes of segregation. However, it may be timely to observe and the court finds as a fact that no zones have apparently been created or maintained for the purpose of promoting desegregation; that the whole plan of "building schools where the pupils are" without further control promotes segregation; and that certain schools, for example Billingsville, Second Ward, Bruns Avenue and Amay James, obviously serve school zones which were either created or which have been controlled so as to surround pockets of black students and that the result of these actions is discriminatory. These are not named as an exclusive list of such situations, but as illustrations of a long standing policy of control over the makeup of school population which scarcely fits any true "neighborhood school" philosophy.

\* \* \* \* \* \*

The findings of fact in the April 23, 1969 order and all statements in this opinion are treated as findings of fact in support of the order. All of the evidence in the case is considered in support of the order.

## ORDER

Based upon the evidence and upon the foregoing findings of fact the orders of the court are as follows:

1. The motion of the individual defendants to dismiss is denied.

2. No citations for contempt are made.

3. Decision on the faculty assignment plan is deferred pending receipt of a progress report from the board on or before August 4, 1969.

4. The one year penalty on transferring high school athletes is disapproved with direction as above for appropriate personal communication to rising high school students.

5. The provision of transportation for students transferring from a majority to a minority situation is approved.

6. The board is directed to proceed no further with action on Metropolitan High School pending a showing by the board that the school if constructed will be adequately desegregated and a finding by the court to that effect. This is based upon the previous findings that the board's decision on Metropolitan was unduly affected by racial considerations and that the board has not accepted its affirmative legal duty to build school facilities so as to promote desegregation.

7. As to the other building projects referred to in the motion for restraint on construction, the burden remains upon the defendants to show that these programs will produce desegregation. The written material tendered by the defendants on this subject is lengthy, and

does not appear to sustain that burden. However, decision on the request for injunction against projects other than Metropolitan will be delayed pending further study of the evidence.

8. It is further ordered that the defendants proceed to prepare and submit by August 4, 1969, a positive plan for desegregation of the pupils of the Charlotte-Mecklenburg school system, as originally directed on April 23, 1969. A witness, Dr. Finger, described in detail a plan for desegregation by changing certain school zone lines and merging certain schools into districts and using certain schools as feeders for others. This plan shows a high degree of realism in that it minimizes the necessity for long-range transportation and takes substantial advantage of location and makeup of populations. Local school administrators consider such a plan feasible. The local school administrative staff are also better equipped than Dr. Finger, a "visiting fireman," to work out and put into effect a plan of this sort. It is believed that if the resources of the board can be directed as originally ordered toward preparing a Charlotte-Mecklenburg plan for the Charlotte-Mecklenburg schools, desegregation of both faculties and students may be accomplished in an orderly fashion. Counsel are requested to notify the court promptly if more time beyond August 4, 1969 is needed.

This the 20th day of June, 1969.

## SUPPLEMENTAL FINDINGS OF FACT IN CONNECTION WITH THE ORDER OF JUNE 20, 1969

The relatively complete extent of the segregation of the schools in this system is demonstrated by study of the defendants' statistics which were attached to and included in the original opinion of this court of April 23, 1969. There are about 24,000 black students in the county. As near as can be estimated, approximately 21,000 of these attend schools within the City of Charlotte. When Brown v. Board of Education was decided in 1954, the City of Charlotte had less than 7,500 black students. Today within the City of Charlotte 14,086 black students attend 21 schools which are totally black or more than 99% black. An additional 2,895 black students attend six schools whose black population is between 50% and 86% black. These schools are all rapidly moving to a totally or near-totally black condition under present policies. When all this is put together and understood, it becomes clear that of the City's 21,000 or so black students, nearly 17,000 of them according to the figures, and certainly more that 17,000 when. the population trends are considered, are attending racially identifiable black schools.

This the 24th day of June, 1969.