UNITED STATES of America

v.

PLAQUEMINES PARISH SCHOOL BOARD et al.

Civ. A. No. 66-71.

United States District Court, E. D. Louisiana, New Orleans Division.

Dec. 8, 1971.

David D. Allen, Jr., Civil Rights Div., U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Sidney W. Provenzel, Jr., New Orleans, La., Luke A. Petrovich, Buras, La., for defendants.

CHRISTENBERRY, District Judge.

This case is presently before the court on a motion for supplementary relief. The government, as petitioner, seeks greater faculty integration in the Plaquemines Parish public school system and asks that majority-to-minority student transfers be allowed in addition to the other means being used to overcome the effects of dual-system education.

In recent years there have been significant inroads made upon the long history of de jure school segregation in Plaquemines Parish. While this case in ordinary circumstances, like any school desegregation case, would have presented difficult questions, this matter is further complicated by unusual geographical conditions. This, of course, refers to the Mississippi River which bisects this elongated rural parish before finally reaching the Gulf of Mexico. The Riv-

er, heavily traveled by large ocean-going vessels and often fog enshrouded, can be crossed only by public ferry or private vessel. With this impediment in mind, the court has considered the government's request for supplementary relief. Like all school desegregation litigation, this case must be considered with regard to the specific factual situation out of which it arises; no standard answer is possible. Green v. County School Board, 391 U.S. 430, 439, 88 S.Ct. 1689, 20 L. Ed.2d 716 (1968). Using this approach, and for the reasons hereafter assigned, the court has tried to strike a balance between the requirement for a truly unitary school system and the reality of an adverse geographic situation.

The parties have stipulated that for the 1971–1972 school year there are 233 teachers for the four public schools [1] in Plaquemines Parish. Of these teachers, about 22 percent are black and 78 percent white. The parties also stipulated as to the racial composition of the student bodies of these four schools, the results indicating that for 1971–1972 approximately 37 percent are black and 63 percent are white. The racial distribution of teachers and students by school for the current year is as follows:

| SCHOOL | TEACHERS | | STUDENTS [2] | |
| | White | Black | White (approx.) | Black (approx.) |
| --- | --- | --- | --- | --- |
| Belle Chasse (west bank) | 66 | 3 | 1365 | 351 |
| Phoenix (east bank) | 0 | 36 | 39 | 646 |
| Port Sulphur (west bank) | 43 | 5 | 640 | 423 |
| Buras (west bank) | 73 | 7 | 1343 | 599 |

The United States Supreme Court has consistently required faculty desegrega-

1. Each of these schools includes kindergarten and grades one through 12. Next year (1972–1973) the Boothville-Venice School, inoperable since hurricane Camille in 1969, will reopen.

2. These figures are based on a stipulation signed by the government and the School Board attorneys on August 25, 1971. At the end of the 1970–1971 school year,

tion as an integral step in the dismantling of state-imposed dual school systems. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 18–19, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); United States v. Montgomery County Board of Education, 395 U.S. 225, 232, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969); Green v. County School Board, 391 U.S. 430, 434–435, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Rogers v. Paul, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965); Bradley v. School Board, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965). In dealing with faculty desegregation in Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211, 1217–1218 (5th Cir. 1969) (en banc), rev'd in part (as to timing of student reassignment) sub nom. Carter v. West Feliciana Parish School Board, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970), the Fifth Circuit stated that faculties were to be desegregated as follows:

[T]he principals, teachers, teacher-aides and other staff who work directly with children at a school shall be so assigned that in no case will the racial composition of a staff indicate that a school is intended for Negro students or white students. . . . [T]he district shall assign the staff described above so that the ratio of Negro to white teachers in each school, and the ratio of other staff in each, are substantially the same as each such ratio is to the teachers and other staff, respectively, in the entire school system.

■ At the hearing on this motion, counsel for the School Board took the position that increased faculty integration was not possible because all teach-

the Scottville School located on the west bank was closed. This was an all-black school and its 187 students were reassigned, with about three-fourths now attending Belle Chasse and the remaining one-fourth attending Port Sulphur. (The figures given above for student distribution include the students who formerly attended the Scottville School.)

ers for the 1971–1972 school year had been hired and school had already commenced. He stated that each teacher had entered into a contract with the school board specifying that he or she would be assigned to teach at a particular school. It was therefore contended that to reassign a teacher now would be a breach of the contract by the School Board with the result that numerous teachers would probably quit. This conclusion drawn by the School Board is predicated on the rural isolation of parts of Plaquemines Parish and below-average salaries. It was further submitted by the defendant that because of recent hurricanes, living accommodations are not readily available and thus even if teachers could be found who would move into the more remote parts of the Parish, there would be no place for them to live. These arguments, tenuous as they are, have some validity for the 1971–1972 school year, but they clearly are invalid as to future school years beginning with 1972–1973.

■■ It is clear to this court that the school system of Plaquemines Parish is not yet a unitary system and it is also clear that if the matter were left in the hands of the Parish school authorities, the system would never achieve unitary status. Geographical isolation cannot justify perpetual racial isolation where alternatives for desegregation exist.

■ It is now this court's intention to see that unitization, commensurate with the geographical situation, is achieved in Plaquemines. To this end it will be necessary that the *Singleton* guide for faculty desegregation be fully invoked commencing with the 1972–1973 school year. Further piece-meal desegregation in this regard is prohibited. Ample time remains for the school officials to make all necessary arrangements regarding living accommodations, competitive salaries, and recruitment of new teachers. As provided hereafter in this order, it will be necessary for the defendant School Board to make periodic progress reports on faculty integration.

■ This court is aware of the immediacy requirement for unitization as clearly enunciated in *Green, supra,* and emphasized in Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969). This requirement has been stringently applied in this circuit. As the Fifth Circuit Court of Appeals stated in *Singleton, supra,* 419 F.2d at 1216:

> The tenor of the decision in Alexander v. Holmes County is to shift the burden from the standpoint of time for converting to unitary school systems. The shift is from a status of litigation to one of unitary operation pending litigation.

Accord, Williams v. Iberville Parish School Board, 421 F.2d 161 (5th Cir. 1970); Charles v. Ascension Parish School Board, 421 F.2d 656 (5th Cir. 1970); Jenkins v. City of Bogalusa School Board, 421 F.2d 1339 (5th Cir. 1969). In this case, the most immediate effective date for the accomplishment of full faculty integration is the beginning of the next school year (1972–1973). In bringing about this aspect of unitization, the attention of the School Board is directed to the rule in this Circuit that "[t]he school district shall, to the extent necessary to carry out [desegregation], direct members of its staff as a condition of continued employment to accept new assignments." *Singleton, supra,* 419 F.2d at 1218. In addition, as outlined above, each school faculty is to have a ratio of 22 percent black teachers to 78 percent white teachers.

■ Turning now to the government's request that a majority-to-minority transfer policy be established, it is felt that this is also a necessary measure for school desegregation in Plaquemines Parish and a measure which should be put into operation commencing with the 1972–1973 school year. On June 27, 1967, this court ordered into effect a freedom-of-choice desegregation plan for the Parish. That plan failed to achieve unitization and on August 18, 1971, it was superseded by a new order which called for assigning students to schools

solely on the basis of geographic criteria. That assignment plan is now to be supplemented by an optional majority-to-minority transfer system. Just as the 1967 plan failed to achieve unitization, the present plan is not unitary as regards the Phoenix School. Phoenix is virtually a one-race school accommodating approximately 13 percent of the total students in the school system. Accordingly, as a school which is racially identifiable, it is incumbent upon this court to take whatever steps are deemed feasible to alleviate the continuing effects of de jure school desegregation. In this case majority-to-minority transfers are warranted.

■■■ The School Board must take immediate steps to publicize this innovation in the school system to all students and parents. The school officials must use the means that will most effectively create an awareness of this new transfer system. In addition, all necessary accommodations must be made for those eligible students who choose to transfer out of a school in which their race is the majority into a school in which they are in the minority. The exercise of this option is the exercise of a constitutional right and the school officials must act scrupulously to see that no student is discouraged from freely making a choice. Ample authority exists in this circuit for the use of majority-to-minority transfer provisions in conjunction with student assignment plans based on other criteria. See United States v. Hale County Board of Education, 445 F.2d 1330 (5th Cir. 1971); Lee v. Macon County Board of Education, 443 F. 2d 1367 (5th Cir. 1971); United States v. Texas Education Agency, 443 F.2d 1372 (5th Cir. 1971). Accordingly,

It is therefore ordered that commencing with the 1972–1973 school year the defendant, Plaquemines Parish School Board, institute full faculty desegregation in the Plaquemines Parish public school system so that the ratio of black teachers to white teachers in each school is the same as the ratio of black to white teachers in the school system as a whole.

It is further ordered that commencing with the 1972–1973 school year the defendant, Plaquemines Parish School Board, institute a system of majority-to-minority transfers for students throughout the Plaquemines Parish public school system. This innovation is to be fully publicized beginning immediately and all necessary measures are to be taken concerning the transportation and supervision of those eligible students who elect to transfer.

It is further ordered that the defendant, Plaquemines Parish School Board, on April 15, 1972, and December 1, 1972, and on the same dates annually thereafter until further order of this court, shall file with the clerk of this court a report setting forth the following information (see United States v. Hinds County School Board, 433 F.2d 611, 618 (5th Cir. 1970)):

I.

(a) The number of students by race enrolled in Plaquemines Parish;

(b) The number of students by race enrolled in each school of the Parish;

(c) The number of students by race enrolled in each classroom in each of the schools in the Parish.

II.

(a) The number of full-time teachers by race in Plaquemines Parish;

(b) The number of full-time teachers by race in each school in the Parish;

(c) The number of part-time teachers by race in the Parish;

(d) The number of part-time teachers by race in each school in the Parish.

III.

Describe in detail the manner in which the majority-to-minority transfer provision of this order has been publicized and made known to all parents and children in the school system.

### IV.

Describe the requests and the results which have accrued, by race, under the majority-to-minority transfer provision which is a part of this order.

### V.

State the number of inter-district transfers granted since the date of this order, the race of the students who were granted such transfers, and the school district to which the transfers were allowed.

### VI.

(a) State whether the transportation system in the Parish is desegregated to the extent that black and white students are transported daily on the same buses;

(b) State how many students of each race are being transported to and from school by the Parish.

### VII.

State whether all facilities such as gymnasiums, auditoriums, and cafeterias are being operated on a desegregated basis.

### VIII.

Give a brief description of any present or proposed construction or expansion of facilities such as the reopening of the Boothville-Venice School. State the estimated number of students by race that will be affected.

### IX.

State whether the School Board has sold or abandoned any school facility, equipment, or supplies having a total value of more than $500.00 since the date of this order.

### X.

(a) State whether there is a bi-racial advisory committee to the School Board in Plaquemines Parish;

(b) If so, state whether the bi-racial advisory committee has submitted recommendations to the School Board;

(c) If so, state the number and disposition of such recommendations;

(d) If a bi-racial committee is in existence, state briefly the areas of the education process in which the bi-racial committee is functioning or is to function.