**Norwood HIETT et al.**

v.

**Joyce BIONDI et al.**

**Civ. A. No. CA 4-2468.**

United States District Court,
N. D. Texas,
Fort Worth Division.

Feb. 20, 1975.

John Plath Green, H. Wayne Meachum, Dallas, Tex., for plaintiffs.

Wayne A. Rohne, Arlington, Tex., Tim Curry, Criminal Dist. Atty., Tarrant County, Gerald Summerford, Asst. Dist. Atty., Fort Worth, Tex., for defendants.

## MEMORANDUM OPINION

MAHON, District Judge.

The plaintiffs in this action have challenged the constitutionality of the Kennedale Independent School District alleging it was racially created and maintained. The case was tried to the Court on January 8 and 9, 1975. The Court having heard two days of testimony makes the following findings of fact and conclusions of law.

The Kennedale Independent School District (hereinafter KISD) was created in 1909 and was comprised of approximately 10.21 square miles. It continued until December 1971 when it was dissolved by a vote of the citizens of the district. The evidence indicates that the motivating force or cause of that election was that the citizens were upset by a reevaluation of their property after they voted a school bond in the amount of one million three hundred and fifty thousand dollars ($1,350,000.00). They were also dissatisfied with the school administration at that time, including both the school board and the superintendent of schools. The election dissolving the district was a planned legal maneuver by the citizens to attempt to rid themselves of the school administration, the property reevaluation, and *especially* the higher taxes resulting from the bonds.

An integral part of the plan to dissolve was to immediately reincorporate and reestablish the KISD. This is evidenced by the fact the petition to dissolve the district and the petition to reincorporate it were circulated and signed at the same time. This point is further evidenced by plaintiff's Exhibit 15, a Kennedale newspaper, which stated that if the KISD was abolished it would immediately be reincorporated into a new system with a new administration.

The KISD was reestablished by a majority vote in an election held in January, 1972, approximately six weeks after it had been dissolved. The reincorporation was effectuated as quickly as was legally possible. Neither the dissolution nor reincorporation was in any way motivated by racial or ethnic considerations. The district created in January 1972 is identical with the boundaries that existed prior to the dissolution. There was no gerrymandering, no meandering boundary lines to omit or include families because of race, of the KISD boundaries. In fact, at the time the district was recreated in January 1972 there was no new area in which they could incorporate because they were bounded on four sides by other independent school districts. While the Texas Education Agency refers to the KISD as a new district, this Court takes judicial knowledge that it is the identical district that existed from 1909 until dissolution in December 1971. The KISD is still composed of approximately 10.21 square miles. The City of Kennedale covers approximately four square miles with a population of approximately 3,000 people. The scholastic enrollment of the KISD is approximately 850 to 875 students, and the district employs approximately 70 people including teachers and support personnel.

While the KISD would be considered small in size and number of scholastics when compared with the Dallas or Fort Worth School Districts, it is not small when compared with over fifty percent (50%) of the independent school districts in Texas. The testimony of Harold Phillips of the Texas Education Agency established that fifty percent (50%) of the twelve hundred (1,200) independent school districts in Texas had less than one thousand (1,000) scholastics; four hundred twenty (420) districts had less than two hundred (200) scholastics with the smallest district having sixty (60) scholastics. In comparison the KISD could not be considered a small district. This Court does not hesitate to question the economic feasibility of operating many of the small to medium sized districts in this state but that is not the question before the Court.

There are approximately eighteen other independent school districts in Tarrant County. There are no districts

which are solely black but there are several districts with no blacks. The KISD is surrounded by four fully integrated school districts and the KISD is itself a fully integrated school system. There are minority and ethnic groups attending the KISD at present and they have attended school in the district both before and after January, 1972. The testimony shows that approximately fifty (50) such minority students including Mexican-Americans, Koreans, and American Indians attend the Kennedale schools. There is also testimony that a Mexican-American teacher is employed by the school. The evidence shows that at least one black[1] resides within the district, but that no blacks of school age now reside in Kennedale nor have any resided there since its reincorporation in January 1972. The last black scholastics that resided in the KISD lived there in the early 1960's. Their father chose to send them to a private school in Fort Worth.[2] There is no evidence or even suggestion that blacks have not been or would not be permitted to attend this school system. Such action would certainly result in the loss of all state and federal aid. The representative of the Texas Education Agency testified that to his knowledge there had been no discrimination against blacks or other minorities, and that investigation of such matters were part of his job responsibility.

The KISD is currently on probation by the Texas Education Agency (hereinafter TEA), however, the probation is in no way related to racial or ethnic matters. The testimony of Mr. Phillips, of the accreditation division of the TEA, revealed that the probation is primarily based on physical facilities and partially on the uncooperative attitude of some members of the community. After the KISD was reestablished in January, 1972, a bond issue was passed in the amount of eight hundred thousand dollars ($800,000.00), but these bonds were not and could not be sold because this suit was filed shortly after the bond issue passed. The sale of these bonds, however, would remedy the primary reason for lack of accreditation, the physical facilities, and the probation would be lifted. Mr. Martin, a specialist in curriculum and staff development with the TEA, testified that the curriculum and staff were typical of school districts of the same size and resources. In his opinion the KISD more than met the minimum requirements for curriculum and staff. Now that the bonds can be sold and the physical facilities built, the KISD will be justified on a sound educational basis.

The stated policy of the KISD is that everyone is entitled to an equal education regardless of race, creed, or color. There is no evidence that this policy has not been adhered to and followed in practice. There is no evidence of any plan, regulation, custom, usage, design, or purpose by the KISD either to deny admission to any black or minority student or to deny employment to any black or minority teacher. There has been no systematic exclusion or policy of exclusion by the KISD of any racial or ethnic group. The evidence only shows that no black scholastics resided within the district either at the time it was recreated or at any time since.

This Court believes one-hundred percent in fully integrated school systems. This is the only way to bring about an educated and enlightened people. We must live together, work together, and study together. This Court further believes it is under an affirmative duty imposed by the Supreme Court in Green v. County School Board, 391 U.S. 430, 437, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) to eliminate racial discrimination root and branch.

---

1. Mr. Joe Davis, a 67 year old black man, testified that he lived in the KISD but that no black school age children lived there.

2. The evidence before the Court indicated that their father, a prominent Fort Worth doctor, sent them to Fort Worth County Day School, a high quality private school.

The Supreme Court in Brown v. Board of Education, 347 U.S. 483, 74 S. Ct. 686, 98 L.Ed. 873 (1954), directed the federal courts to eliminate racially separate public schools established and maintained by state action. A survey of the many cases following *Brown* indicate that any plan which allows a dual school system to exist in a district will not be permitted.

In Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the Court considered all the circumstances surrounding the adoption of a "freedom-of-choice" plan which allowed a pupil to select his own public school. In that case there were two schools in the district, one white and one black, and 21 school busses traveled overlapping routes to transport pupils to and from the two schools. The Court found that the state had organized and operated a dual system, with separate black and white schools, in violation of the *Brown* directive, and, therefore, the plan was constitutionally infirm. The Court further stated that the obligation of the district courts was to consider all the circumstances in determining if the district was operating dual schools, one black and one white. If that situation was found to exist, they further directed the district courts to eliminate discrimination root and branch.

In the year following *Green, supra,* the Supreme Court decided U. S. v. Montgomery County Board of Education, 395 U.S. 225, 89 S.Ct. 1670, 23 L. Ed.2d 263 (1969). In that case there was one school district in Montgomery County, Alabama, and it operated one set of schools for white students and white teachers, and one set for Negro students and Negro teachers. The Court upheld the plan of the district court which required that the students and teachers in each school in the district reflect "substantially or approximately" the same ratio of black to white as existed according to the population of the district.

In 1971 the Supreme Court decided Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). The case arose because approximately 29% (24,000) of the pupils in the district were Negro, and about 14,000 of the Negro students attended 21 schools that were at least 99% Negro. The Court affirmed the proposed plan of the district court in part and remanded in part to fully develop a realistic desegregation plan "which works now." That case also involved a dual system in which there was one school for blacks and one for whites. Yet, *Swann* does provide some helpful language in their discussion of racial balances and one-race schools. The objective in these cases is to see that school authorities exclude no pupil of a racial minority from any school directly or indirectly, on account of race; it does not and cannot embrace all the problems of racial prejudice. *Swann, supra,* at p. 23, 91 S.Ct. 1267, 28 L.Ed.2d 554. Regarding the existence of a small number of one-race schools within a district the Court directed a close scrutiny of such schools and the placing of the burden on school authorities to satisfy the Court that the racial composition is not part of past or present discrimination. The Court was quick to point out, however, that there cannot be a *per se* rule that segregation exists. The Court further stated that the existence of one race or virtually one race schools within a district is not in and of itself the mark of a system that practices segregation. *Swann, supra,* at p. 26, 91 S.Ct. 1267, 28 L.Ed.2d 554.

All the cases previously cited involve dual school systems. At least two schools were located in the district and state action was used to maintain one set of schools for blacks and one set for whites. We are concerned, however, with a school system consisting of only one school. Every child in the district regardless of race or ethnic background, attends that one school, and thus, it accurately reflects the racial and ethnic composition of the district. Even im-

posing the strict scrutiny required of a one race school within a district consisting of several schools, the KISD has met the burden of proof that no discrimination or segregation exists. After considering all the evidence in the case, as directed by the Court, this Court can find no dual school system perpetuating past or present discrimination.

■ The plaintiffs cite United States v. Texas, 321 F.Supp. 1043 (E.D.Tex. 1970); 330 F.Supp. 235 (E.D.Tex. 1971); affirmed, 447 F.2d 441; affirmed, 404 U.S. 1206, 92 S.Ct. 8, 30 L. Ed.2d 10; as the primary basis for holding the KISD unconstitutional. In that case there were nine all black school districts. Six of the districts had less than one hundred students, one had less than two hundred students, and two had less than two hundred and fifty students. The curriculums were severely limited and their special equipment and facilities were primitive. The facts of that case further developed that boundary lines were changed and territory was annexed or detached from neighboring districts to remove the white children from the black districts and the black children from the white districts. Thus, state action was, without a doubt, perpetuating a dual school system. Judge Justice held, and this Court fully agrees, that "separate neighboring or overlapping school districts, one black and the other white, are unconstitutional when created and maintained to perpetuate a dual school system. . . ."[3]

■ The facts in the case at bar, however, do not touch on the facts of U.

S. v. Texas, *supra*. In this case there is no showing of any dual school system. There are no all black districts in Tarrant County; the KISD is surrounded on four sides by fully integrated school districts, and the KISD itself is an integrated district. The evidence has shown that with 850 scholastics the KISD is a medium sized school district, as opposed to the small (less than 100 scholastics) all black districts in the U. S. v. Texas, *supra*. The evidence has shown in this case that the curriculum is not severely limited, but rather is typical of districts of this size and more than meets the minimum curriculum and staff requirements of the TEA. There has been no gerrymandering of boundary lines in the KISD to remove any child from the district, as occurred in U. S. v. Texas. Indeed, in case of the KISD their boundary lines were already established by the boundaries of the preexisting districts which surrounded them. Further distinguishing the two cases is the fact that the facilities of the KISD are not primitive as they were in U. S. v. Texas. It is true that the facilities need expansion to again meet the accreditation requirements of the TEA, but in filing this suit the plaintiffs have prevented the sale of the previously approved bonds needed to meet this expansion requirement. After the sale of the bonds, the KISD can be justified on a sound educational basis. Thus, while this Court is in complete agreement with the law stated in U. S. v. Texas, *supra*, as applied to those facts, I do not feel it is dispositive of the case at bar with the particular facts which have been presented here.

3. 321 F.Supp. at 1050. Specifically the plaintiffs rely on the following quote.
"The Court further believes that:
Actions of the State or any of its agencies or officials resulting in the creation, operation, support and general supervision of small school districts whose school facilities are attended exclusively or almost exclusively by members of one race and whose existence cannot be rationalized upon sound educational grounds are unconstitutional in that they result in the denial to students of equal educational opportunities. Turner v. Warren County

Board of Education, *supra*, N.C., 313 F. Supp. 380, 330 F.Supp. at 238.
Evidently, the plaintiffs contend that this sentence, taken out of context and without relation to the facts in U. S. v. Texas, requires a *per se* holding of unconstitutionality. Obviously, under *Swann*, *supra*, there is no *per se* rule and each case must ride its own bottom. Therefore, while this Court is in agreement with this statement as applied to the facts of U. S. v. Texas, it does not touch the facts presented in the case at bar.

The question before this Court is whether the actions of the KISD amounted to the creation and promulgation of a dual school system, to maintain an all white district and an all black district. Viewing all the circumstances, this Court can find no evidence of a dual system. The mere fact that no black school aged children have resided in the district from the time of its recreation does not make this district *per se* unconstitutional. *Swann, supra.* This Court holds the KISD to be constitutional.

What this suit boils down to is a fight over taxes. The plaintiffs opposed a bond issue and school taxes, but they lost the bond election. Alternatively, they have chosen this lawsuit as a vehicle to fight that bond issue. In an effort to help their pocketbooks, they have attempted to argue racial discrimination as a backdoor approach when it was in no way factually supported.

This Court holds the Kennedale Independent School District to be constitutional and that the plaintiffs take nothing with all costs to be taxed against them.