Delois YARBROUGH, a Minor, age 15 and Thel Yarbrough, a Minor, age 13, by and through their father and next friend, B. J. Yarbrough, Plaintiffs,

v.

The HULBERT–WEST MEMPHIS SCHOOL DISTRICT NO. 4 OF WEST MEMPHIS, ARKANSAS, a Corporation, et al., Defendants.

Delois YARBROUGH et al., Plaintiffs,

v.

The HULBERT–WEST MEMPHIS SCHOOL DISTRICT NO. 4 OF WEST MEMPHIS, ARKANSAS, a Corporation, et al., Defendants,

Ricky Yarbrough, a Minor, age 10, and Maurice Yarbrough, a Minor, age 6, by their father and next friend, B. J. Yarbrough, et al., Applicants for Intervention.

Civ. A. No. J–65–C–8.

United States District Court,
E. D. Arkansas,
Jonesboro Division.

July 23, 1971.

George Howard, Jr., Pine Bluff, Ark., Jack Greenberg, Derrick A. Bell, Jr., New York City, for plaintiffs.

G. Ross Smith and Robert V. Light, Smith, Williams, Friday, Eldredge & Clark, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

EISELE, District Judge.

The Hulbert-West Memphis School District No. 4 of Crittenden County, Arkansas, comprises about 105 square miles of that county, including West Memphis, a city having a population of some 25,000. The area outside West Memphis but within the district has characteristics varying from rural to semi-suburban.

This litigation was initiated in 1965 in an effort to disestablish the dual system of schools the district was then operating on a basis of segregation by race. This Court approved a freedom of choice plan in the latter part of 1966 and dismissed the case. The plaintiffs appealed from the dismissal of the suit and from certain aspects of the desegregation plan pertaining to staff desegregation. The Eighth Circuit Court of Appeals, with considerable reluctance, affirmed the actions of this Court in approving the plan but reversed the Court's decision to dismiss the case, calling upon it, in effect, to oversee future progress. The Circuit Court set no absolute rules for furthering staff desegregation, but did make the "firm suggestion" that the district achieve "full and effective faculty and staff integration hopefully by 1968–69 and in no event later than the beginning of the 1969–70 school year." Yarbrough v. Hulbert-West Memphis School District, 380 F.2d 962 (1967).

This "firm suggestion" was not followed. The proceeding lay dormant from 1967 until late in 1970.[1]

In November of 1970, sometime after a sounding of the Court's entire docket, certain patrons of the district sought leave to intervene as parties plaintiff. Leave was promptly granted, and, after further pleading and conferences between the Court and counsel, the district filed a report of the status of desegregation in the district as of January 4,

---

1. It will be recalled that the judgeship of the court to which this case was assigned fell vacant in August of 1969 and remained vacant until August 1970.

1971. The report made it clear that the district had achieved only token faculty and staff integration at the elementary level and little to moderate faculty and staff integration at the junior high and high school levels. For instance, at West Memphis High School there were 34 white teachers and two blacks; at Wonder Junior High there were 11 white teachers and 22 full-time and one part-time blacks; at Dobbs Elementary there were 13 whites and two blacks; at Wedlock Elementary there were 16 black teachers and one part-time white; and at Bragg Elementary there were 18 white and no black teachers.

The plan for student desegregation had been in operation since its approval by the Court in 1966. It will be remembered that this aspect of the district's plan had not been appealed to the Circuit Court. It was of the type known as a "freedom-of-choice" plan, whose most striking characteristic was that it permitted each child, or the parents of each child, to choose, from among the schools in the district appropriate to the child's age and achievement level, that school he wished to attend. The choices thus made were generally honored by the district except when overcrowding of a facility would result. The Supreme Court of the United States in 1968 decided Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed. 2d 716, which held such plans unconstitutional if they did not actually produce an effective level of student desegregation. The defendant district's report of January 15, 1971, made it clear that this particular freedom-of-choice plan had not done so.

The Court directed the district to propose a plan for the immediate alleviation of some of the inadequacies of its then-current method of operation. After briefing by all parties and conferences between the Court and counsel, certain interim changes in the school system's operation were voluntarily instituted by defendants during the spring semester. As a result, the district was operating a school system as of the close of the

1970–71 school year with the following characteristics:

The overall ratio of white to black students enrolled in the district's schools is approximately 52% to 48%. The ratio of white to black teachers employed by the district is approximately 60% to 40%. All eleventh and twelfth grade students attended classes at the West Memphis Senior High School and all tenth grade students at the Wonder Senior High School. The students in these three grades were all considered students at one high school, a school which has classes in buildings located some distance apart. At the junior high level, two schools, East Junior High and West Junior High, had student bodies approximately 27% black and 73% white, with total enrollments of about 575 and 700 respectively. Wonder Junior High, with an enrollment of about 600 students, was overwhelmingly black, with only a token number of white students. All the schools so far mentioned are located within the city limits of West Memphis. Students in the upper six grades who lived outside the city were furnished transportation to school by the district. The district owns and operates about 15 school buses.

The district operated eight schools at the elementary level, seven within the West Memphis city limits and one, the Wedlock school, situated at the small farming community of Edmondson, about ten miles from the western edge of West Memphis. The student bodies of five of these schools—Weaver, Maddux, Dabbs, Richland, and Bragg—were overwhelmingly white. Dabbs had the largest percentage of blacks, 21%, and Maddux the lowest, less than one per cent. The student bodies at two of the remaining three elementary schools, Wonder and Wedlock, were all-black, and the other one, at Jackson, had only three white students out of a total enrollment of about 340.

The composition of the teaching staffs at the various schools in the district, after the adjustments made in the spring term of 1971, ranged from 20%

to 75% black. At the high school level, the West Memphis Senior High had a faculty 25% black and 75% white, while the Wonder High School's faculty was 48% black and 52% white. At the junior high and elementary school levels, black teachers were in the minority at every school in which black students were in the minority, and were in the majority at every school in which black students were in the majority. At Wonder High School, as indicated, the ratio of blacks to whites on the faculty was 48% to 52%, and at Weaver Elementary School the ratio was 32% blacks to 68% whites. At no school other than these two did the ratio of black teachers to whites approach the 40% to 60% ratio characteristic of the district as a whole.

Considering the status of integration, both of staffs and of student bodies, all the schools in the district below the high school level remained racially identifiable as of the close of the 1970–71 school year.

Having in mind the history of this litigation, the factual characteristics of the district, and the situation existing in the schools of the district at the close of the 1970–71 school year, we come to the issue before the Court: the adequacy of the district's proposed plan for the 1971–72 school year. That plan calls for a continuation of the previous arrangement, for the tenth through twelfth grades: all eleventh and twelfth grade students will attend classes at West Memphis High School and all tenth grade students will attend classes at Wonder High School. Junior high students (i. e., those in grades seven through nine) will be assigned to West Junior High, Wonder Junior High, or East Junior High on the basis of geographic attendance zones. These junior high zones were drawn so as to include the entire geographical area included in the district's boundaries. The projected ratio of white to black students at these three schools is as follows: 53% black and 47% white at Wonder Junior High; 53% white and 47% black at West Junior High; and 50% black and 50% white at East Junior High.

The district's proposed assignment of students at the elementary level is also based on geographic attendance zones. The district stated in its tentative plan that it would "gerrymander" the elementary zones so as to achieve increased integration. It has done so, and its proposal would indeed increase the level of integration dramatically at the elementary level. The lowest percentage of black students at any of the eight elementary schools would be 29% and the highest 77%. Wonder and Wedlock would be the only remaining black-majority elementary schools in the district, but they would both be heavily black: 77% at Wedlock and 73% at Wonder. The projected black percentage enrollments at the formerly "white" elementary schools would be 29% at Richland, 29% at Bragg, 35% at Weaver, 45% at Maddux, and 43% at Dabbs. Jackson, which was formerly almost all-black, would become 70% white and only 30% black under the proposal. The district used only contiguous geographic zoning as a means of assigning students to elementary schools. Methods such as pairing and noncontiguous zoning were not employed by the district in its proposed plan.

Separate mention should be made of the students living in the district but outside the city limits of West Memphis. In past years, and as of the end of the 1970–71 school year, all students in grades seven through twelve and all white elementary school students were assigned to schools in the city of West Memphis and provided transportation at the expense of the district. The elementary-age black students living in this area were assigned to Wedlock Elementary School. Some of them, perhaps 60 or 65, walked to school or provided their own transportation, but the majority, about 300, were also provided bus transportation at the expense of the district. In their plan for the 1971–72 year, the defendants propose that Wedlock serve the same area as before but that whites

living in the area also attend Wedlock instead of schools within West Memphis. No students, white or black, would be assigned to Wedlock if they lived within the city. All students in grades seven through twelve, as before, would be assigned and provided transportation to schools inside the city limits.

The proposed assignments of administrative staff members, and the race of each person involved, are set forth in the plan. The proposal pledged that efforts would be made to increase the level of faculty and administrative staff integration and that any reassignments would be made on a nondiscriminatory basis. No mention was made of hiring or promotion policies to be followed in the future.

The plaintiffs have objected to the defendants' plan and have proposed two alternatives to it. On one of these, no evidence was presented at the hearing and it will be treated as having been abandoned. The other was developed by Dr. Michael Stolee, an expert retained by the plaintiffs to formulate an alternative plan for the desegregation of the district's school system.

Dr. Stolee is a Professor of Education and the Associate Dean of the School of Education at the University of Miami at Coral Gables, Florida. He is the director of the Florida School Desegregation Center and has been a consultant to the Department of Health, Education and Welfare's Office of Civil Rights, to its Title I program, and to the Justice Department's Civil Rights Division. He has had broad experience with the desegregation problems of many individual school districts throughout the country.

The plaintiffs' objections to the defendants' proposals are grounded on two premises: that the district's plan would not produce a unitary school system but rather would perpetuate a system of racially identifiable schools, and that the district's plan should, but does not, make adequate provision for insuring that a reasonable proportion of black faculty and staff be maintained in the future or that black staff members are not discriminated against in respect to salary, position, and opportunity for advancement.

The plan proposed by Dr. Stolee would, it is asserted, cure the claimed deficiencies by providing as follows: the eleventh and twelfth grade students would be assigned as proposed in the district's plan, that is, all would attend the West Memphis Senior High School. All ninth and tenth grade students would attend classes at what is now Wonder Junior High School. To accommodate the additional number of students this arrangement would bring to that facility, portable classrooms now being used at Wedlock, Maddux, and Wonder Elementary Schools would be brought to the Wonder Junior High site and put into use there.

Junior high schools, in Dr. Stolee's plan, would be composed of students in grades six through eight. These students would attend classes at the buildings now being used for West Junior High, East Junior High, and Wonder High Schools. Students would be assigned to these schools on the basis of the same attendance zones as indicated in the district's proposal for junior high attendance areas. These zones would presumably produce a level of integration in the various schools very nearly approximating the overall district ratio of black students to whites.

At the elementary level, which would now consist of grades one through five, students within the city of West Memphis, according to Dr. Stolee's plan, would be assigned on the basis of the same geographic attendance zones as were proposed by the district for elementary pupils in its plan. The Wedlock school, however, would be abandoned as a teaching facility, and the students who live outside West Memphis and would otherwise have attended Wedlock would be assigned to the elementary schools inside West Memphis in such a manner as to maximize integration. These students (and those above elementary age who live outside the city lim-

its) would be furnished transportation to school at the district's expense.

With respect to faculty and administrative staff, Dr. Stolee's plan would have required the following commitments of the defendants: the proportions of blacks in these categories in the system as a whole would not be permitted to fall below those indicated in the district's proposed plan, and affirmative efforts would be made to bring the proportion of black staff members up to the proportion of black students in the district. No black staff member would be dismissed except for cause. (It should be noted that Arkansas has no teacher tenure law. School districts may, in the ordinary case, dismiss a teacher for any reason or for no reason at all.) Finally, all pay and other benefits of employment would be distributed to all staff members in the district without regard to race.

For convenience, Dr. Stolee's plan was sometimes referred to at the hearing as the 5–3–2–2 plan and that of the district as the 6–3–3 plan. Both sets of numbers, of course, indicate the groupings of grade levels of students who would attend school in the same building.

The following witnesses testified at the hearing: Mr. O. M. Shultz, the district's superintendent of schools; Dr. Stolee; and Mrs. Bennie Taylor, the black principal of Wedlock Elementary. The Court was favorably impressed by all three.

■ In his analysis of the problems facing the defendant school district, Dr. Stolee appeared to be objective, fair and reasonable. His 5–3–2–2 proposal appears to have much merit from both a practical and educational point of view. However, neither Dr. Stolee nor this court was elected or chosen by the patrons of the school district to make decisions or to give advice upon such matters. The school district's own 6–3–3 plan also appears to have merit and to be dictated in many respects by historical and practical considerations. Generally the school board's decision upon

such matters should not be interfered with, provided same does not make impossible or impracticable the realization by all of the students of the district of their constitutional rights.

Before even considering any other plan, it is incumbent upon the Court to examine the proposal of the school board. If that plan meets constitutional requirements, the Court should look no further. It is for the school board, not the Court, to establish educational policy. And it is not for the Court to pick and choose among various plans where each meets constitutional requirements. If the board's plan meets muster, that should end it.

Looking at the school board's plan for 1970–71, it must at first be emphatically stated that so much of that plan which deals with the junior high school and high school student populations clearly meets constitutional standards. It must also be stated that the board's faculty assignment plan satisfies such requirements. The only area of possible dispute is in connection with the board's plan for the desegregation of the elementary schools.

■ The weakness of the defendants' elementary school plan is evidenced by the anticipated results in four or possibly five of the elementary schools, to wit: Wedlock, Wonder, Richland, Bragg, and possibly Jackson. Rather significant racial imbalance exists in each of these schools. On the one extreme, Wedlock and Wonder have 23% and 27% white students and, on the other, Richland and Bragg have 29% black. Jackson has 30% black. The Court agrees with the plaintiffs that this imbalance, particularly in Wedlock and Wonder, would, without more, probably lead to serious and difficult problems. The Court does not believe that the defendants have adequately analyzed and dealt with such problems.

It is a fact of our national life and history that our black population, having always been in a minority status in the nation, is better able emotionally and

psychologically to cope with the problems of such minority status. The whites, on the other hand, having traditionally been in the majority, find it difficult to so cope if they are placed in such a minority status. It is not enough to admit that it is more probably the problem of the white parents than their children. In either event the problem exists and should be dealt with head-on.

The Court finds that it is unlikely there will be any exodus from the Richland or Bragg elementary schools of black students who are in a minority situation in those schools. Conversely, however, the Court finds that there is a real threat that there might be such an exodus from Wedlock and Wonder, not just because the whites are in the minority, but because they are in such a disproportionate minority. If the ratio in these schools were closer to 50:50, even though the whites were still in the minority, the Court finds that there would be substantially less likelihood of such an exodus. Therefore, while permitting the defendants to continue Wedlock Elementary School in existence, the Court must require that the defendants modify their plan in a manner which will make it clear that the percentage of white students in Wedlock and Wonder will not fall below the minimums to be established by the Court. See *infra*. Indeed, the Court would welcome a modification of the plan which would substantially increase the proportion of white students in both Wonder and Wedlock and at the same time reduce the slight imbalance in the other three elementary schools referred to above. The Court is not at this time requiring that such modifications be made. It is of the opinion, however, that the failure to move in this direction will bring about problems which will have to be dealt with by the board, and possibly the Court, during the fall of this year. And no one should be more aware than the defendants of the turmoil and difficulties which, of necessity, will accompany any major adjustments made during the school year. The Court is further of the opinion that such problems might well be avoided if they are faced, and realistically dealt with, *now*.

Plaintiffs have made a strong showing as a basis for their contention that no elementary school desegregation plan can succeed without closing Wedlock. The Court disagrees, however, being of the opinion that a good faith implementation and operation of a reasonable elementary school desegregation plan will substantiate defendants' position that Wedlock can be operated as a viable, and educationally sound, elementary school and still be in compliance with the Constitution and laws of the United States with respect to desegregation. Furthermore, it is not feasible to close Wedlock during the 1971–72 school year. If, however, after a few months operation of the schools in the fall of this year it becomes apparent that an effective desegregation plan for the elementary schools may not be possible with the use of Wedlock, the defendants, and—if necessary—the Court, will then be in a position to reconsider the matter. And, of course, there are other ways to desegregate the elementary schools if defendants' plan fails in its implementation. Pairing of such schools as Wedlock and Richland and/or of Wonder and Bragg, wherein the first three grades would attend one and the second three grades the other, might have to be considered. The Court, however, believes that there are advantages in plans such as that proposed by the defendants—essentially a modified neighborhood school plan—which should not be sacrificed unless necessary to meet constitutional standards. The Court can only adopt a "wait and see" attitude.

The defendants' elementary school plan does not achieve precise racial balance in each of the elementary schools. It should be noted that the law does not require such precise balance. Indeed, as stated in Swann v. Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 1280, 28 L. Ed.2d 554, 571 (1971):

"If we were to read the holding of the District Court to require, as a matter

of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse. The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole."

Nevertheless, the district courts are permitted to use minimum racial balance proportions, where feasible in particular cases, as a means of setting the perimeters of compliance with the requirement to establish a unitary school system. The Court concedes that in some factual contexts the use of even such perimeters might be error. Here, however, it appears that such a device will be useful, feasible and legally proper.

The Court, by its order entered today, will require the defendants to submit to the Court a modified plan for the elementary school grades pursuant to which the racial balance in each of the elementary schools will not fall below a 30:70 proportion, one way or the other. That is, the minority in any particular school, whether black or white, may not constitute less than 30% of that school's population. Although the Court's order may require the defendants to make some slight adjustments in their geographical zoning and/or require a slight change in school transportation, the Court is of the opinion that such modifications and adjustments can be accomplished without any great difficulty. Indeed, as pointed out above in the discussion of the problems anticipated at Wonder and Wedlock, the Court is hopeful that the defendants' modified plan will do more than merely bring the four elementary schools, which are presently outside of the perimeters to be set by the Court's order, into minimum compliance with that order. The Court is hopeful that the defendants will come up with a plan that is likely to succeed and is likely to create a stable condition which will not call for further supervision or action by the Court. Given a plan which is sound and has the prospects of succeeding, the Court would be inclined to consider favorably a motion to dismiss, at least after receiving a report reflecting successful operation under the plan for a period of several months.

It might be observed that it is a rather strange constitutional principle which would declare that schools with a minority population of 23%, 27%, or 29% would fail to meet that standard, whereas schools with a minority population of 30% would presumptively satisfy constitutional standards. The problem here, however, is not the actual percentage figures in the plan so much as it is the *workability, or prospects of success*, of the plan. It is true that the slight percentage changes required, as a *minimum*, by the Court's order will not guarantee the success of the plan but those changes, when coupled with the requirement to *maintain* minority percentages at 30% or above, do increase the probability of success. And, again, the defendants may choose to go further by dramatically reducing the imbalance and thereby increasing the prospects of establishing, once and for all, a solid, stable, workable plan. To the extent that defendants approach the actual district ratio of blacks to whites in each of the elementary schools, to that extent will the benefits and burdens of constitutional compliance be shared equally by all.

The Court recognizes the right of the students of the integrated schools of the district to receive their education from an integrated faculty. The Court further recognizes that it has the power and the duty to enforce this right by appropriate orders. Furthermore, in evaluating the ratio of black teachers to white teachers and black administrative personnel to white administrative personnel in the defendant district, the Court noted from the bench at the commencement of the trial that the number of black personnel, considering the ratio of black to white students in the district, was marginal. On the other hand, the Court recognizes that the defendants

have obviously made a sincere effort to integrate the faculties of the various schools on the basis of the personnel available to them. For the present, the Court does not feel that the facts of this case warrant any specific requirement with respect to hiring or firing policies. Suffice it to say that, should the present precarious balance not be improved, or at least maintained, in the future, the courts are available to provide relief in accordance with the teaching of United States v. Montgomery County Board of Education, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969) and Kelley v. Altheimer Arkansas Public School District No. 22, 8 Cir., 378 F.2d 483.

Plaintiffs' alternate proposal also requests that the defendants be enjoined from proposing or constructing any new school facilities which tend to perpetuate racially identifiable schools. In view of the Court's decision with respect to student integration, the location of school facilities becomes less important. As long as the defendants know that their school facilities will have to be fully integrated, the location thereof in either a "black" residential area or a "white" residential area will simply not have the effect of perpetuating segregation. It is true that location of school facilities is extremely important and that the court might, on occasion, be required to intervene to protect the constitutional rights of the parties concerned. At this juncture, however, it would appear that the location of such facilities, as a practical matter, will simply establish the degree of busing, if any, which the defendants might be willing to impose upon the district. The Court will not at this time enter any order limiting the authority or the discretion of the defendants with respect to the construction of new facilities. It is assumed that, as a matter of good faith to all the patrons of the district, defendants will make known their plans with respect to such matters sufficiently far in advance to permit the views of all to be obtained and considered.

The plaintiffs have made a strong case for an order for the appointment of a bi-racial committee of patrons of The Hulbert-West Memphis School District to advise and consult with the school board of said district and its officials in handling the problems which will arise in the implementation of the defendants' desegregation plan. The Court is convinced that such a bi-racial committee, if brought into being *voluntarily* at the direction of the defendant school board members, could, and would, provide a useful service to the school district in dealing with the problems which will inevitably arise. However, the Court is equally convinced that such a bi-racial committee, created by order of a court, would be more a source of friction than of help in the solution of such problems. Therefore, plaintiffs' prayer in this respect will be denied.

