Jeffrey HART, as a minor by his parent and next friend Doris Hart, et al., Plaintiffs,

v.

The COMMUNITY SCHOOL BOARD OF BROOKLYN, NEW YORK SCHOOL DISTRICT #21, by its President and Defendants.

The COMMUNITY SCHOOL BOARD OF BROOKLYN, NEW YORK SCHOOL DISTRICT #21, By its President and Member, et al., Defendants and Third-Party Plaintiffs,

v.

John V. LINDSAY, Mayor of the City of New York, et al., Third-Party Defendants.

No. 72 C 1041.

United States District Court, E. D. New York.

July 26, 1974.

Nathaniel R. Jones, James I. Meyerson, NAACP Special Contribution Fund, New York City, for plaintiffs.

Hyman Bravin, New York City, for defendant and third-party plaintiff Community School Board No. 21.

Elliot P. Hoffman, New York City, for defendant Chancellor Scribner and third-party defendants City of New York, Mayor of the City of New York, Administrator, Housing and Development Administration of the City of New York, Housing and Development Administration of the City of New York.

Thomas N. Rothschild, Brooklyn Legal Services, Corp. A, Brooklyn, for intervenor.

## MEMORANDUM, ORDER, AND FINAL JUDGMENT

WEINSTEIN, District Judge.

Pursuant to this court's direction, the Special Master has filed two reports. The first, dated July 1, 1974 (73 pages), deals with "The School Plan." The second, dated July 8, 1974 (109 pages, plus photographs), covers "Physical and Hu-

man Renewal" of Mark Twain's environs. Both reports are comprehensive, sensitive, and practical responses to the challenge posed by this litigation to create a viable, constitutionally acceptable educational system in Coney Island. The court expresses its gratitude to Curtis J. Berger, the Special Master. His reports reflect a grasp of relevant legal, educational, economic and sociological problems and result from patient consultations with people at every level of government and in all walks of life in School District 21.

Extensive hearings have been held on the Special Master's Reports. All parties were permitted to call any witnesses, submit written responses and examine the Special Master under oath. With the consent of the parties, the court again viewed Coney Island and its environs. In addition, the court received communications from various groups and persons affected.

## THE SCHOOL PLAN

■ As institutions with limited powers, courts are mandated by law and tradition to interfere as little as possible in the work of other branches of government. So long as the Constitution and laws are not violated, state school officials must be afforded the broadest latitude to meet their educational responsibilities.

A majority of the Supreme Court reaffirmed its mandate of deference to local school board judgment when it wrote:

> [L]ocal control over the educational process affords citizens an opportunity to participate in decision-making, permits the structuring of school programs to fit local needs and encourages "experimentation, innovation and a healthy competition for educational excellence."

Milliken v. Bradley, 418 U.S. 717, 742, 94 S.Ct. 3112, 3126, 41 L.Ed.2d 1069, 1089 (1974).

■ With the proviso that any program employed must promise "realistically to work," Green v. County School Board, 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968), local authorities retain wide discretion to choose among acceptable programs of desegregation. In "this field the way must always be left open for experimentation." United States v. Montgomery Co. Board of Education, 395 U.S. 225, 235, 89 S.Ct. 1670, 1675, 23 L.Ed.2d 263 (1969); see also, e. g., United States v. Jefferson Co. Board of Education, 380 F.2d 385, 390 (5th Cir.), cert. denied, 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed.2d 104 (1967); Moss v. Stamford Board of Education, 350 F. Supp. 879, 880 (D.Conn.1972); United States v. Midland Independent School District, 334 F.Supp. 147, 148 (W.D. Tex.1971); Yarbrough v. Hulbert-West Memphis School District No. 4 of West Memphis, Ark., 329 F.Supp. 1059, 1064 (E.D.Ark.1971); Bradley v. School Board of City of Richmond, Va., 325 F. Supp. 828, 832–833 (E.D.Va.1971); Brice v. Landis, 314 F.Supp. 974, 977 (N.D.Cal.1969).

The three plans before the court considered by the parties are: (1) the defendant School Board's for a magnet school; (2) the Special Master's for another form of magnet school; and (3) Model II of Professor Dan W. Dodson, a distinguished educator and consultant to the plaintiffs.

While the original complaint sought only desegregation of Mark Twain Junior High School, each of these three plans provides for desegregation of all of the middle schools of District 21, including Mark Twain, by providing for a 70–30 ratio of white to minority children in each school. Each plan thus meets a fundamental precept of Professor Kenneth Clark, a widely respected expert in this and related fields, that desegregation not be "piecemeal." The issue of segregation of lower schools and high schools in District 21 and of schools in other districts is not before the court in the present litigation.

## SCHOOL BOARD'S PLAN

■ The School Board's plan, as supplemented by a proposed pupil assignment plan, would provide a ratio of ap-

proximately 70 (white)–30 (minority) in all middle schools in the district through busing and rezoning. At least during the first few years of the operation of its plan, two schools (I96 and J281) would be utilized at approximately 110% of capacity and the utilization of other schools would range down to about 75% (P238). During the first year, Mark Twain would be grossly underutilized at about 25% of its rated capacity and at about 33% of its special school capacity as computed by the Special Master. By the end of the third year Mark Twain would be operating at approximately 65% of rated capacity and 100% of the effective capacity as determined by the Special Master. Overcrowding in some of the other middle schools would be reduced by 1977 as students from them went to Mark Twain.

The resolution of the School Board outlines the changes as follows:

I. To redraw the feeding patterns of the middle schools so that the incoming grade of each intermediate, junior high school, and 7th and 8th grade of K–8 schools will reflect approximately 70% Caucasian, 30% "Minority" population that is the approximate ratio of the district's middle schools. A small variation may be necessary in the implementation.

II. A) Graduate the 8th and 9th grade of Mark Twain to High School.

B) Transfer the present 7th grade of Mark Twain and zone the graduating pupils of P.S. 188 and P.S. 238 to other middle schools in the district (with all of the existing services and programs they would have had in Mark Twain).

III. Establish at Mark Twain a District School for *Gifted and Talented Children* . . .

A) Entrance by application and selection only.

B) Admit only pupils who are graduating from elementary schools and would normally attend junior high school or intermediate schools in Dis-

trict 21. Students in the 6th grade of K–8 schools shall be eligible.

Those students accepted for the program leaving 6th grade to go into 7th grade at Mark Twain. Those students accepted for the program leaving 5th grade to go into 6th grade at Mark Twain.

C) Original group to be about 333 pupils or more.

D) Approximate ratio of 70% Caucasian, 30% "Minority" to be adhered to at Mark Twain School for Gifted and Talented Children.

E) No new SP or SPE programs will be organized henceforth in any school in the district. (Existing programs will continue to graduation).

F) Parents will have the right to have the gifted and talented child returned to his zoned school immediately for any reason.

### SPECIAL MASTER'S PLAN

The Special Master's plan is essentially a variant of the School Board's, developed in much greater detail with attention to such matters as curriculum, community planning, zoning changes, staffing, funding, recruitment of students and the like. All middle schools would be held at a ratio of 70–30 and over a three year period Mark Twain would be phased into full operation with a register of more than 1000 students. A new school to occupy the Mark Twain building is modeled on that of John Dewey High School, an experimental high school in the district which is reported to be successful and has a substantial waiting list of those seeking to transfer to it.

### PLAINTIFFS' PLAN

The proposal urged by the plaintiffs does not contain details of zoning but is sufficiently precise to permit the Board of Education's staff to draw detailed, workable zones and busing schedules. It provides for a more even utilization of all middle schools than does the School Board's plan—with "no school . . .

less than 80% utilized and none more than 90%." With regard to ethnic variations, the range is essentially the same as that proposed by the School Board—"no school should have more than 77.3% nor less than 67.3%" white enrollment.

The Dodson proposal as to Mark Twain is described by him as follows:

Raise utilization to 30% which would require 1,396 students. "Others" enrollment at present of 135 would be augmented by 791 if minimum percentage were achieved. 577 of these would be sent from the lower end of the P.S. 281 zone. One hundred-ten would be transferred from the 228 zone. This would leave the arrangement short of the guideline standard by only 114 students.

Present Black enrollment of 309 is 57 above the guideline requirement. The Puerto Rican enrollment of 239 is 51 above the guideline specification.

These three imbalances with regard to the guidelines are the result of not compensating for fuller utilization of the schools in the "Others" areas. These could be handled administratively. If "CR" class were removed from the building it would reduce the Black by 27, the Puerto Rican by 26 and the "Others" by 8.

There is no doubt that the Board's and Special Master's plans do place a somewhat heavier burden on minority students than does the plaintiffs' proposal because more minority students and fewer white students would be bused under the formers' proposal. Projections supplied by the Master indicate that when the plans are fully operative, under the plaintiffs' in the order of 950 minority students will be bused out of Central and Western Coney Island and 750 white students bused in; under the "Magnet School" plan, equivalent figures are 1050 minority and 650 mainly white. In the first year of operation the difference is appreciably greater. In addition, as perceived by minority residents of the Mark Twain area, the School Board's proposal tends to deprive

them of Mark Twain as a valuable community oriented resource. The white community (except for Sea Gate), while perceiving any of the proposed changes as a heavy burden, views the School Board's plan as less onerous than the plaintiffs'.

Neither the Master's nor the School Board's proposals were designed to be punitive in any sense. Both were conceived in a good faith attempt to meet the Constitution's mandates and to provide effective education for all children in the district. Given the limited power of the court with respect to educational policy, the court concludes that it is bound to accept the judgment on this matter of school authorities even though the burdens of desegregation are not exactly equalized. It should be noted that the overwhelming majority of students in the district will be going to exactly the same school they would have attended had no desegregation program been adopted.

Professor Clark objects to the magnet school plans on grounds of fundamental educational policy. Among other points he makes is that providing special schooling for "gifted" students leads to an elitist attitude deleterious to all students, including those "favored," and to society as a whole. Consistent with that philosophy he would abolish the special programs available for many decades in each of the Junior High Schools in the city that permit enriched curricula and the completion of the 7th, 8th, and 9th grades in two years.

We cannot ignore the weight of professional support for the proposition that singling out gifted and talented children for special assistance is desirable. In a report undertaken at the request of Congress, for example, the United States Commissioner of Education summarized his findings as follows:

A *conservative* estimate of the gifted and talented population ranges between 1.5 and 2.5 million children out of a total elementary and secondary school population (1970 estimate) of 51.6 million.

Existing services to the gifted and talented do not reach large and significant subpopulations (e. g. minorities and disadvantaged) and serve only a very small percentage of the gifted and talented population generally.

Differentiated education for the gifted and talented is presently perceived as a very low priority of Federal, State, and most local levels of government and educational administration.

Although 21 States have legislation to provide resources to school districts for services to the gifted and talented, such legislation in many cases merely represents intent.

Even where there is a legal or administrative basis for provision of services, funding priorities, crisis concerns, and lack of personnel cause programs for the gifted to be miniscule or theoretical.

There is an enormous individual and social cost when talent among the Nation's children and youth goes undiscovered and undeveloped. These students cannot ordinarily excel without assistance.

Identification of the gifted is hampered not only by costs of appropriate testing—when these methods are known and adopted—but also by apathy and even hostility among teachers, administrators, guidance counselors and psychologists.

Gifted and talented children are, in fact, deprived and can suffer psychological damage and permanent impairment of their abilities to function well which is equal to or greater than the similar deprivation suffered by any other population with special needs served by the Office of Education.

Special services for the gifted (such as the disadvantaged) and talented will also serve other target populations singled out for attention and support.

Services provided to gifted and talented children can and do produce significant and measurable outcomes.

States and local communities look to the Federal Government for leadership in this area of education, with or without massive funding.

The Federal role in delivery of services to the gifted and talented is presently all but nonexistent.

Education of the Gifted and Talented, Report to the Congress of the United States by the United States Commissioner of Education, prepared for the Subcommittee on Education of the Committee on Labor and Public Welfare, United States Senate, Committee Print 3–4 (1972).

Whatever sympathy the court may have for either of these conflicting views, they must be left to be debated and acted upon by educational authorities. As already noted, this court's jurisdiction is narrowly confined to the issue of whether the plans will in fact desegregate Mark Twain Junior High School—i. e., provide a racial and ethnic mix reflective of that in the district's middle school population. We must, therefore, put aside Professor Clark's eloquent plea for a broader view of our educational structure. Members of the School Board and Administration were present in court during his forceful presentation and, presumably, will consider it in determining future action. "It is for the school board, not the Court, to establish policy." Yarbrough v. Hulbert-West Memphis School District No. 4 of West Memphis, Ark., 329 F.Supp. 1059, 1064 (E.D.Ark.1971).

The objections of the plaintiffs' expert, Professor Dodson, to the magnet school plans are directed to two points: (1) they delay desegregation by requiring three years for Mark Twain to achieve a register of over 1000 students (the target required by this court's order of January 28, 1974), and (2) they are "voluntary" for white students of the district but not for students presently attending Mark Twain.

The court is satisfied by the report of the Special Master that a magnet school of the type envisaged by him or the local

School Board requires a three year phasing-in period if it is to succeed. It must bow to the School Board's expertise on this point. Convinced that the Board is making a good faith attempt to desegregate schools in District 21, this aspect of these plans is accepted by the court with the following proviso. The magnet school plan will be deemed to have failed if there are not in attendance at Mark Twain—in the ratio of approximately 70–30, white to minority students—at a minimum at the beginning of the school year in September 1975, 350 students; in September 1976, 750 students; and in September 1977, 1050 students. Pursuant to the Master's recommendations, the plan will also be considered to have failed if at least 400 children have not expressed an intention to enroll in the program at Mark Twain by March 15, 1975; 800 children by March 15, 1976; and 1100 children by March 15, 1977, in order to allow for natural attrition and in order to provide adequate time for an alternative plan should failure be highly probable.

The court has been convinced by the report of the Special Master that, realistically, a magnet school of the type envisaged cannot be fully operative in the year 1975. It should be noted, however, that under these proposals there will be full integration in all Junior High Schools—including Mark Twain—throughout the district as of September 1975, even though Mark Twain will remain underutilized for two more years.

The second objection, that the magnet school plans are wholly voluntary is, as the Special Master properly notes, invalid. The court is not approving a "voluntary" program since, under both the School Board's and the Master's proposals, no new special SP or SPE programs for gifted children may be organized henceforth in the district, except at Mark Twain Junior High School, though the existing programs may continue until children presently enrolled graduate. Thus, any parent or child wishing to take advantage of such programs must utilize the Mark Twain school. In view of the strong desire of parents and children in District 21 to participate in such programs if it is possible to do so, depriving children of the right to exercise the option except at Mark Twain constitutes pressure which, as a practical matter, is the equivalent of compulsion.

Under the proposal of the School Board the parents would have the right to have gifted and talented children return from Mark Twain to the school they would otherwise attend for any reason at any time. Under the proposal of the Special Master this period is limited to "three months after the commencement of the school year." The local School Board plan must be modified to include this limitation of three months or it will not be acceptable. Without such a modification stability and the assurance of workability cannot be attained.

In order to provide for an alternative plan should the "Magnet School" concept fail, by January 1, 1975, the Chancellor, in cooperation with the School Board, shall provide, in reserve, detailed proposals for new zoning and busing schedules based on "Model II" of the proposal of Dr. Dodson. The full reserve plan shall be kept up-to-date by necessary modifications based upon changes in population. Modifications shall be prepared by January 1, 1976 and by January 1, 1977 for the next succeeding school year. To allow for attrition, the student body of Mark Twain shall be no less than 1100 under the "Model II" plan.

The School Board may utilize either its own proposal for "Gifted and Talented Children" or the modified form of that proposal in the Master's Report designed to provide a "Magnet School." One year for preparation, from September 1974 to September 1975, should be sufficient time to prepare for operation of the school.

## HOUSING AND COMMUNITY RENEWAL PLAN

Authorities at every level of city, state, and federal government, including the Mayor of the City of New York, the

Borough President of Brooklyn, officials of various departments and authorities, and private foundations, have begun to take action to meet the goals and plans set out in the Special Master's report on "Physical and Human Renewal." In view of this cooperative spirit and the complexity of the matter, a rigid decree at this point is undesirable. The decretal tool is poorly designed for restructuring an entire community. Accordingly, the court makes no order with respect to housing and other recommendations of the Special Master now, reserving the right to do so later. These recommendations involve the allocation of substantial amounts of funds beyond the power of this court to provide; many millions of dollars have already been made available for use in Coney Island by federal authorities since this court's order of January 28, 1974. The court stands ready to assist the parties and others by appropriate post-judgment orders with respect to general changes in the community required if a viable integrated school system is to survive.

## ADDITIONAL MATTERS

While the court has been impressed by the reservoir of goodwill and skill available in the various levels of government and through private groups and persons, the hostility in the courtroom mirrored in the faces of some black and white spectators, and some of the mail and other communications received by the court during the pendency of this proceeding, suggest that the road ahead will be extremely difficult if individuals and groups do not refrain from stirring up unnecessary racial division and hostility.

The record in this case once again demonstrates that black and other minority children fear for their safety and emotional peace in white communities that they perceive as hostile and violent; white children share these fears in reverse. Such anxieties are based in large measure on separation and ignorance fostered by unconstitutional segregation such as exists at Mark Twain, leading to adult attitudes that preserve racism in our society.

As Justice Marshall declared yesterday:

[U]nless our children begin to learn together, there is little hope that our people will ever learn to live together.

Milliken v. Bradley, 418 U.S. 717, 94 S. Ct. 3112, 3146, 41 L.Ed.2d 1069, 1113 (1974). While he wrote in dissent, this portion of his opinion represents an assumption about a fundamental characteristic of our country's citizenry—dedication to equality and the proposition that people of diverse backgrounds can live together in peace and harmony. Upon what we assume is in the hearts of our countrymen rests the jurisprudence of *Brown* and twenty years of school desegregation decisions and legal literature.

Much depends upon the attitude of the children. The court is convinced that, given a clear presentation of the facts and the opportunities, the young people of District 21 communities can rise to the challenge now posed and that they will do so. This is their opportunity to make a major contribution to American society by insuring that constitutionally mandated desegregation, at Mark Twain and the other junior high schools of the district, works.

The exceptionally large number of private schools in the district, educating some one-third of the students living there, presents a real challenge to desegregation of the public school system. Should the teachers and other educators of the public schools fail to provide an effective system of teaching all the children, the public school system will bleed almost to death through the loss of many of its best students to private education. In that event the public school system would be left to those too poorly connected to transfer to private schools.

Monthly reports to this court shall be required from all parties beginning on September 30, 1974, indicating what progress has been made to date and what problems, if any, have arisen.

This Memorandum and Order constitutes a final judgment. In accordance with normal equity practice, the court retains jurisdiction to make reasonable modifications in the decree as required by changing circumstances.

No stay will be granted by this court during the pendency of any appeal. A stay at this point would disrupt the effective implementation of desegregation efforts in District 21 required by the Constitution and decisions of the courts of the United States. To be effective, vital preliminary work must commence at once and must continue during the period when appeals, if any, are pending.

So ordered.